UNITED STATES of America, Plaintiff,

v.

Carlos Sorla GARCIA, Defendant.

No. 78 CR 24.

United States District Court,
E. D. New York.

May 3, 1978.

21. 393 F.Supp. at p. 857.

David G. Trager, U. S. Atty., E. D. New York, Brooklyn, N. Y. (Lawrence J. Zweifach, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for plaintiff.

John J. Monteleone, Brooklyn, N. Y., for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendant, charged with possession, with intent to distribute, of heroin hydrochloride in violation of 21 U.S.C. § 841(a)(1), moves to suppress evidence seized from and statements made by him on January 6, 1978.

At the hearing the sole witness was Gerard Whitmore, a special agent of the Drug Enforcement Administration ("DEA"). This testimony, which the court finds thoroughly credible, established the following facts.

Whitmore, who had been a DEA agent for some four years, and DEA agent Robert Sears were detailed to LaGuardia Airport on January 6, 1978 to monitor "domestic flights" bringing narcotics to the New York area from "source cities." By late afternoon of that day they had monitored nine flights from Chicago but had neither stopped nor arrested any passenger.

At about 4:50 P.M. they had been sitting for some twenty minutes in a waiting area when an American Airlines flight from Chicago arrived. About eighty passengers disembarked, and after it appeared that all passengers had departed the agents saw defendant "dart out." He was slightly bent over in a "running position", had his hands in the pockets of his raincoat which was "pulled around tightly in front of him" with the collar turned up, and had "an unordinary bulge" in the middle of his back.

Defendant came into the waiting area, looked about, and immediately started "darting" toward the exit faster than other people. The agents decided to "surveil" him but had to run to catch up with him because he was walking at such an extremely fast pace, "a double step, very quick."

After hurrying down the American Airlines wing defendant passed through the baggage claim area without picking up any luggage, went outside so rapidly that he missed the sign for taxis closest to American Airlines, looked behind him to see if anyone was following, saw the taxis at United Airlines some distance away, and walked very rapidly in that direction. At the United Airlines taxi line he stopped, and the agents approached him, identified themselves as federal narcotics officers, and asked him if he would mind showing identification and his airline ticket.

Defendant produced an Armed Forces Service card and responded that he had not taken a flight but had been waiting all day at LaGuardia Airport for his brother who was flying in from Puerto Rico. The agents knew, of course, that there were no flights from Puerto Rico to LaGuardia Airport. Defendant also indicated that there was some urgency for him to leave the airport. He appeared extremely nervous, with his hands trembling and his speech "fluttery". When asked for his "service number" defendant gave a completely different number from that on the Armed Forces Service card.

Whitmore then asked defendant in a quiet tone of voice if to avoid embarrassment he would kindly accompany the agents inside the terminal, as the lighting outside was poor and people were looking at them. Defendant responded "Sure, let's go in." As they proceeded into a hallway adjacent to the public telephone area and within public view Sears inquired if defendant was wearing a back brace, and he replied that he was.

In the terminal Whitmore took from his own pocket a card and read defendant his "*Miranda*" warnings, and defendant said he understood his rights. In response to Whitmore's questions defendant reiterated that he had not taken a flight but had been waiting all day for his brother to fly in from Puerto Rico. With that Whitmore stated that he believed it was possible defendant was carrying narcotics and that Whitmore would like to search him but could not do so without his permission or obtaining a warrant from the courts.

Defendant replied that he had nothing to hide and proceeded to remove both his raincoat and his sports jacket. Sears, who was standing behind defendant, motioned to defendant's back. Whitmore then said he knew that defendant had just arrived on a flight from Chicago and that Whitmore had seen a ticket in defendant's jacket and knew he had something on his back.

With that defendant became very excited and yelled, "You got it, you know it" and "take it, take it." When Whitmore asked "What do we have?" defendant said "narcotics." To Whitmore's question as to what kind of narcotics defendant answered "that's it" and reached up under the back of his turtle neck shirt and pulled out a package. When the package appeared Sears took it, and the agents placed defendant under arrest.

I

The Fourth Amendment provides in pertinent part that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The first question is thus whether the agents' initial stop of defendant was "unreasonable" within the meaning of the Amendment, for if it was the narcotics obtained as a result must be suppressed. The stop was, of course, a "seizure" though occurring before defendant's formal arrest. *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The Fourth Amendment was designed to reflect "the concern of our society for the right of each individual to be let alone", *Schneckloth v. Bustamonte*, 412 U.S. 218, 242, 93 S.Ct. 2041, 2056, 36 L.Ed.2d 854 (1973), and to prohibit unjustifiable police intrusions which are overbearing, harassing, frightening, or humiliating. *Terry v. Ohio, supra*, at 10, 14, 15, 88 S.Ct. 1868; *United States v. Ortiz*, 422 U.S. 891, 895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). By making searches and seizures improper only when they are "unreasonable" the Amendment invites the courts to weigh against that value the indubitable need for police investigation if crimes are to be solved, *United States v. Iovine*, 444 F.Supp. 1085, 1087 (E.D.N.Y.1978), and if law enforcement officials are to cope with grave offenses with heavy costs to society. *United States v. Oates*, 560 F.2d 45, 59 (2d Cir. 1977).

In striking the balance in a case involving an investigative stop at least four factors are pertinent: the gravity of the offense suspected, the probability of the suspect's implication in the offense, the need for prompt action, and the extent of the intrusion. *United States v. Oates, supra* at 59. Since the test is what is "reasonable", plainly, for example, the lesser the seriousness and immediacy of the crime, the lesser the intrusion justified and the greater must be the likelihood of the suspect's involvement. There are no doubt circumstances where the enormity of the crime is such (placing bombs in a courtroom, for example) that all in the pertinent vicinity may be stopped even though the probability of an offense is small. Conversely to make a stop to investigate a minor peccadillo by one unlikely to depart or to dispose of the evidence would require highly substantial grounds for suspicion and in any event would warrant only the most moderate intrusion. *Id.*

The result in each instance depends on the several variable factors, and therefore one case is of limited usefulness as a precedent in another. But one thing has been clearly established, and that is that the probability of the suspect's implication in crime must be determined by an objec-

tive test, namely, by reference to "specific and articulable facts" rather than mere police "hunch", *Terry v. Ohio, supra,* 392 U.S. at 21–22, 88 S.Ct. 1868, though those specific facts are to be viewed through the eyes of the law enforcement officer in the light of his experience and training. *United States v. Magda,* 547 F.2d 756 (2d Cir. 1976).

▇ In determining where the present case falls in the spectrum the court cannot view the stop of defendant from the vantage of hindsight and thus conclude that since it later developed that the agents' suspicions were justified the stop must have been "reasonable". For those innocent individuals who have been improperly detained and thereafter released will seldom if ever appear before a court. It was therefore long ago decided that the protection of the innocent must rest in the exclusion of evidence seized in violation of the Fourth Amendment even from those patently guilty. *Weeks v. United States,* 232 U.S. 383, 391–393, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The Supreme Court has often said that only in that way can unjustified police conduct be discouraged. *Linkletter v. Walker,* 381 U.S. 618, 629–635, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

▇ Viewing the circumstances up to the moment of defendant's stop on the assumption that he was wholly innocent, the court nonetheless concludes that the agents' actions were eminently reasonable. They were there to investigate narcotics trafficking, an offense whose odiousness, gravity and social costs in terms of ruined and wasted lives cannot be questioned. *United States v. Oates, supra,* at 59. They had not been engaged in the indiscriminate detention of large numbers of passengers arriving from "source cities". Indeed, though they had monitored nine flights from Chicago and had seen some eighty persons disembark from the airplane on which defendant rode, they had stopped no one.

When defendant emerged belatedly he had an "unordinary bulge" in his back and proceeded at an extraordinarily fast pace toward the exit. He picked up no luggage but went so fast he missed the American Airlines taxi line, and, looking behind to see if he was being followed, went some distance to the United Airlines taxi line. When the agents at that point asked him for identification and his airline ticket, they did so in quiet and polite terms and did not subject him to humiliating physical treatment.

The objective facts pointed to a significant possibility that defendant was engaged in unlawful activity. It is true that one can imagine circumstances in which a completely innocent person would have acted as defendant did. Some highly nervous but virtuous citizen with a peculiarly bulky back brace who without luggage spent the day in Chicago in a turtle neck shirt and was in a hurry to rejoin his family might have sped as defendant did towards the airport exit, though it is unlikely that he would have waited for some time in the airplane after the other passengers had left or that he would have looked behind him to see whether anyone followed. Perhaps each individual circumstance would be entirely consistent with innocence, but considered as a whole, *United States v. Magda, supra,* at 758, the facts gave rise to a sufficiently "reasonable suspicion" to justify a stop. *United States v. Oates, supra,* at 61.

▇ Given the gravity of the offense suspected, the ease with which narcotics may be disposed of, and the difficulty, almost impossibility, of later tracing the suspect, the agents were at least entitled to make a polite request for defendant's identification and airline ticket. To put it another way the facts suggested a sufficiently high probability of guilt to make it reasonable to ask even a blameless man to identify himself. Merely to require identification from an innocent person whose actions by coincidence fit the pattern from which serious crime may reasonably be suspected is not to exact a disproportionate or unreasonable price.

II

Defendant contends that even if the stop was proper the subsequent seizure of the

package containing narcotics was "unreasonable" and that it should be suppressed. While defendant admittedly consented to the seizure when he said "take it" and reached under the back of his shirt to remove the package, he urges that the consent was "coerced" by the mere presence and questions of the agents. The government responds that the consent was "voluntarily given" and the search therefore valid under the Fourth Amendment. *United States v. Mattock,* 415 U.S. 164, 166, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976).

This court has heretofore set forth its view that to phrase the question in terms of whether the consent was "voluntary" is to use that word in an unnatural way. *United States v. Iovine, supra,* at 1087. Almost every consent which is the product of an exercise of the will to make a conscious choice among alternatives is "voluntary". *Schneckloth v. Bustamonte, supra,* 412 U.S. at 224, 93 S.Ct. 2041. Since it is rational to avoid physical harm even a consent made in response to a threat of bodily injury may be "voluntary", though such a consent would not suffice to allow a search.

■ It is the arbitrary and unreasonable actions of the police against which the Fourth Amendment protects, and if their actions which result in the consent do not meet the requisite standard of fairness under the circumstances the search is "unreasonable" whether or not the consent is rational· and therefore "voluntary". *United States v. Iovine, supra,* at 1088.

In this case the agents gave no hint that they would subject defendant to violence. On the contrary they addressed him in courteous and quiet tones. They were not in uniform or brandishing weapons, and he was not then under formal arrest. They did not threaten him with dire consequences but informed him they could make no search without his consent or the obtaining of a warrant from the courts. They made no promises of any kind.

Though not under arrest he had been given the warnings required by *Miranda v.* *Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and he was in possession of his faculties. It is true that Whitmore testified on cross-examination that when defendant was confronted with his lies and with the fact that the agents believed he was carrying narcotics, he became excited, "was overwhelmed by fear" and shouted "take it, take it." But nothing in the record suggests that this was fear of violence or extra-legal consequences. It was rather the natural apprehension of the lawful penalties for possessing narcotics.

■ Under the circumstances the actions of the agents were reasonable, and the consent was valid. Certainly the case falls well within the established precedents. *United States v. Watson, supra; Schneckloth v. Bustamonte, supra; United States v. Thompson,* 356 F.2d 216 (2d Cir. 1965); *United States v. Gorman,* 355 F.2d 151 (2d Cir. 1965); *United States v. Faruolo,* 506 F.2d 490 (2d Cir. 1974).

### III

■ Defendant suggests that his statements to the agents should be excluded, in particular his response when asked for identification that he had taken no flight but had waited at the airport all day for his brother to arrive from Puerto Rico. Whatever the stage at which a defendant is in "custody" and may not be "questioned" before the warnings laid down by *Miranda v. Arizona, supra,* are recited, the request for identification and an airline ticket was not improper. The purpose of the prophylactic rule of the *Miranda* case is to discourage unfair and oppressive questioning which may lead to unreliable admissions. As *Terry v. Ohio, supra,* and the cases which have followed it show, that rule has no relevance to an investigative stop such as that made here.

■ Defendant's later statement that the package on his back contained narcotics is plainly admissible since it was made only after he had been advised of his rights in accordance with the *Miranda* decision.

The motion is denied. So ordered.