**UNITED STATES of America, Appellee,**

v.

**Douglas T. PRICE, Appellant.**

**No. 586, Docket 78–1386.**

United States Court of Appeals, Second Circuit.

Argued Jan. 24, 1979.

Decided May 18, 1979.

Ronald M. Kleinberg, New York City, for appellant.

Diane F. Giacalone, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Mary McGowan Davis, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for appellee.

Before LUMBARD, FEINBERG and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Douglas Price appeals from a judgment entered in the United States District Court for the Eastern District of New York, Jack B. Weinstein, *Judge*, convicting him, after a plea of guilty, of one count of knowingly and intentionally possessing with intent to distribute approximately one gallon of phencyclidine hydrochloride, in violation of 21 U.S.C. § 841(a)(1). Price was sentenced to a term of two years' imprisonment and four years' special parole. Execution of the sentence was stayed pending disposition of this appeal.

Price's guilty plea was entered pursuant to a court-approved agreement between Price and the government preserving Price's right to appeal the court's denial of his motion to suppress certain evidence.[1] The denial of the suppression motion is challenged on two grounds. The first involves the intricate question of the propriety under the Fourth Amendment of a particular encounter, described below, between Price and federal agents acting without a warrant. The second involves the validity under the Fourth Amendment of a warrantless "consent" search conducted by the agents in the course of that encounter.

According to the government, the federal Drug Enforcement Administration has determined that large amounts of heroin are smuggled into this country from South America and then shipped to certain "source" cities for distribution. Acting on information indicating that couriers frequently purchase drugs in "source" cities and then transport them via domestic flights to "recipient" cities for local sale, the DEA has assigned teams of agents to monitor passengers on flights between certain key airports.

DEA Special Agent Gerard Whitmore is a member of a team assigned to La Guardia Airport, which is located in the Eastern District of New York. His testimony at the suppression hearing, fully credited by the district court, established the following. On May 25, 1977, Agent Whitmore was observing the passengers arriving on a particular American Airlines flight from Chicago, which has been identified by the DEA as a "source" city. Agent Whitmore's attention was first drawn to appellant Price when the agent noticed a delay in the line of passengers walking single file from the airplane into a corridor leading to a waiting area. The delay was caused by Price, who was standing still and who appeared to be scanning the faces of the other individuals in the area. Price was accompanied by a woman, later identified as Irma Bojorquez, and a small child later identified as the child of Price and Ms. Bojorquez. When asked by an airline employee to permit the other passengers to disembark, the three resumed walking, although more slowly than the other passengers. When he reached the baggage area, Price made a brief phone call and then proceeded to the carousel. Price and Bojorquez had each carried a shoulder bag off the plane. Price selected two additional pieces of luggage from the carousel, one of which had no identification on it. The shoulder bag which Price had carried off the plane also bore no identification. Whitmore testified at the hearing that while waiting for his luggage, Price appeared to be nervous and that he appeared to be scanning the faces of the people in the area.

After they picked up their baggage, Price and his companions left the terminal. Al-

---

1. The procedure under which, by agreement, a defendant pleads guilty while preserving an issue for appeal has been approved by this Court in several recent cases. *See, e. g., United States v. Coyne*, 587 F.2d 111, 115 (2d Cir. 1978); *United States v. Fury*, 554 F.2d 522, 524 n.2 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Burke*, 517 F.2d 377 (2d Cir. 1975); *United States v. Faruolo*, 506 F.2d 490 (2d Cir. 1974).

though it was raining, Price ignored the sheltered designated taxi stand outside the terminal, hurried into the street, and hailed a cab. According to Agent Whitmore, Price "threw" all the luggage in the trunk, except for the shoulder bag he had carried off the airplane. This last piece was placed gently on top of the other luggage. In Agent Whitmore's words, Price "cuddled" the shoulder bag as he placed it in the trunk.

Accompanied by two other DEA agents who had joined him in the waiting area, Agent Whitmore followed Price's taxi in a government vehicle. During the ride Agent Whitmore could see Ms. Bojorquez and, occasionally, the child through the rear window of the taxi, but he could not see Price, who appeared to be "slouched down in his seat." The taxi stopped on 106th Street in Manhattan and the driver unloaded the trunk, placing the bags on the sidewalk. Price emerged from the taxi after looking through the rear window. Once again he scanned the street in all directions. Price and Ms. Bojorquez picked up the luggage and headed, with the child, toward the nearest building.

Agents Whitmore and Sears approached Price just as he reached the entrance of the building. Agent Sears asked Price if he had just come from La Guardia Airport. Price, who appeared startled, replied that he had. Agent Whitmore identified himself and Sears as federal officers, told Price not to be startled and explained that they wanted to ask some questions and check that all the luggage was his. Price replied that the shoulder bag was not his, that it had no identification on it and that he did not know how he had gotten it. Price quickly took the bag off his shoulder and placed it on the ground. According to Agent Whitmore, this was the same shoulder bag Price had been carrying when he got off the plane.

Agent Whitmore then told Price that he would like to search the bag but that he could not do so without either a search warrant or Price's permission. He specifically informed Price that he had the right not to grant permission. Price again disavowed ownership of the bag, telling Whitmore, "do what you want with it." When the agents opened the bag they immediately detected the odor of either chloroform or ether. Under some clothing they found several bottles exuding the same strong odor. Believing that the bottles contained heroin in an organic solvent, the agents arrested Price and seized the bottles.

Price did not testify at the suppression hearing but Ms. Bojorquez did. Her testimony contradicted that of Agent Whitmore in several respects. She denied that she and Price had delayed the line of passengers leaving the plane. She also stated that when the agents first approached Price, after he had emerged from the taxi, they had told him three times, "this isn't your bag, you must have picked up the wrong bag" and that only then had Price agreed that the bag was not his and that the agents could do what they wanted with it. In addition, Ms. Bojorquez claimed that before obtaining Price's consent, one of the agents had claimed that he could get a warrant but that it would be easier to search immediately rather than take Ms. Bojorquez and the baby to the station house.

Judge Weinstein believed the testimony of the government witness and upheld the search as justified either (1) as validly consented to by Price, or (2) as incident to, although technically preceding, a lawful arrest based on probable cause.

On appeal, Price offers two theories to support suppression of the crucial evidence. First, he claims that the agents had no reasonable grounds for approaching and questioning him. He therefore urges that the evidence uncovered during the course of that encounter must be suppressed as the fruit of an unconstitutional seizure of his person. Second, Price claims that he did not voluntarily consent to the search of his shoulder bag and that the agents lacked both a warrant and probable cause for the search. Price therefore urges that the evidence in question must be suppressed as the fruit of an unconstitutional search.

## I. The Initial Encounter

The analytical approach employed by the Supreme Court in the recent decision of *Delaware v. Prouse*, —— U.S. ——, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), is especially relevant to our consideration of Price's argument that the agents acted unlawfully when they approached him on the sidewalk and began to ask him questions.

The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness" upon the exercise of discretion by government officials, including law-enforcement agents, in order " 'to safeguard the privacy and security of individuals against arbitrary inva[s]ion . . . .' " Thus, the permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against "an objective standard," whether this be probable cause or a less stringent test.

—— U.S. at ——, 99 S.Ct. at 1396 (footnotes and citations omitted). Here, we are not presented with the question whether there was probable cause to arrest Price initially. Rather, we must determine whether it was lawful for the agents to stop Price and make certain limited inquiries. Accordingly, our starting point must be *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the first Supreme Court case to analyze in Fourth Amendment terms police-citizen encounters that fall short of full arrest.

*Terry* made it clear that although all police seizures of citizens, even those short of arrest, are governed by the Fourth Amendment, not all personal encounters between police officers and citizens are "seizures" under the Fourth Amendment.[2] "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* at 19 n.16, 88 S.Ct. at 1879. *See also id.* at 16, 88 S.Ct. 1868; *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. Wylie*, 186 U.S.App.D.C. 231, 235–237, 569 F.2d 62, 66–68 (1977), *cert. denied*, 435 U.S. 944, 98 S.Ct. 1527, 55 L.Ed.2d 542 (1978); *United States v. Rico*, 594 F.2d 320, 323 (2d Cir. 1979). Here, it is by no means clear that the agents had restrained Price's freedom to walk away prior to the time that Agent Whitmore asked for permission to inspect the contents of the bag.[3] Arguably, therefore, until that time Price had not been "seized" for Fourth Amendment purposes.[4]

---

**2.** In *Terry*, a police officer, suspecting that three men might be "casing" a store, approached the three suspects, identified himself as a police officer, and asked for their names. When the men "mumbled" in response, the officer proceeded to pat down the outer clothing of each man, removing two weapons revealed in the course of these "frisks." *Id.* at 6–7, 88 S.Ct. 1868. The Supreme Court specifically left open the possibility that upon the facts just summarized, no "seizure" had taken place prior to the officer's initiation of physical contact for purposes of searching the men for weapons. In fact, the Court "assume[d] that up to that point no intrusion upon constitutionally protected rights had occurred." *Id.* at 19 n.16, 88 S.Ct. at 1879. Justice White, concurring in *Terry*, was even more explicit than the majority. "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Terry v. Ohio*, 392 U.S. 1, 34, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (White, J., concurring).

**3.** *After* Price denied ownership or even knowledge of the shoulder bag that he had personally carried off the airplane and placed in the taxi, the agents had reasonable grounds to detain him for a brief period in order to pursue the matter further. In fact, in Judge Weinstein's view, Price's incongruous and patently false remark provided the agents with probable cause to arrest Price, even before the illegal drugs were uncovered.

**4.** The exchange preceding Price's false denial was very brief. According to the testimony at the suppression hearing, the two officers, in plain clothes, approached Price and asked in a conversational tone if he had come from La Guardia. At this point they had not identified themselves as officers. They had drawn no weapons and flashed no badges. Concededly

However, because both parties and the court below appear to have regarded the encounter between Price and the agents as a *Terry* stop from the beginning, we will assume without deciding that Price was "seized" by the agents when they first spoke to him. Thus, the question before us is whether the agents' "investigative seizure" of Price, a seizure made for the purpose of asking him questions, was reasonable under the circumstances. We conclude that it was.

■■■ Although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure . . [t]he Fourth Amendment imposes no irreducible requirement of such suspicion." *United States v. Martinez-Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976). Where no articulable grounds for individualized suspicion are proffered, no individualized stop is justified.[5] Where articulable grounds for probable cause are shown, the maximum intrusion of a custodial arrest is permissible. *See Sibron v. New York, supra,* 392 U.S. at 66, 88 S.Ct. 1889 (discussing Peters' appeal, No. 74). Where the articulable facts observed are suspicious yet fall short of probable cause, the reason-

ableness of a particular stop must be gauged by comparing the degree of the intrusion with the grounds for the suspicion that intrusion is called for. "[T]he scope of the particular intrusion, in light of all the exigencies of the case, [should be] a central element in the analysis of reasonableness." *Terry v. Ohio, supra,* 392 U.S. at 18 n.15, 88 S.Ct. at 1878.

■■ Thus, the determination of reasonableness is reached "by balancing the need for the stop against the gravity of the intrusion which the stop entailed." *United States v. Magda,* 547 F.2d 756, 758 (2d Cir. 1976), *cert. denied,* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977), *citing Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868.[6] Such a balancing takes into account both "the public interest and the individual's right to personal security free from arbitrary interference by law officers." *United States v. Brignoni-Ponce,* 322 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975). Only specific and articulable facts and the rational inferences that can be drawn from these facts can be considered in striking this balance. *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. 1868.

Price was startled, but a person carrying valuable and illegal drugs might be expected to be startled if addressed by any stranger on the street, especially one who was obviously aware of his recent movements. This subjective response does not by itself suffice to define the encounter as a restraint on Price's freedom to walk away. When Price replied, "yes," indicating that he had just come from the airport, the officers identified themselves, told Price not to be startled, and asked if all the bags he carried belonged to him. It was at this point that Price denied ownership or knowledge of the bag that had been in his possession.

5. The Supreme Court has recently reaffirmed the principle that even a minimally intrusive stop, if not supported by reasonable suspicion, may be prohibited by the Fourth Amendment. In *Delaware v. Prouse,* —— U.S. ——, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court held that evidence growing out of a random individual stop of a motorist (as opposed to a checkpoint type operation), initiated in the absence of any specific articulable grounds for suspicion, was to be excluded, despite the fact that the intrusion at issue (signalling a moving vehicle to pull over to the side of the road) was relatively minor. *Compare United States v. Martinez-*

*Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), *with United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

6. In *United States v. Magda,* a uniformed police officer patrolling an area of New York City known to have a high incidence of narcotics dealing observed two men exchange something on the street. When the men saw the officer, one of the men walked rapidly in the other direction and one, Magda, walked toward the officer. The officer tapped Magda on the shoulder, asked him to stop, and inquired about what had just taken place. Magda at first replied that nothing had happened but, when asked again, he replied that he had just bought a marijuana cigarette, which he showed to the officer. The officer arrested Magda and upon searching him discovered evidence linking Magda to a bank robbery. The facts supporting the stop in *Magda* were, in our view, no more suspicious than those supporting the encounter with Price, and the stop in *Magda* appears to us to have been no less intrusive than the one now under consideration.

■ The need for a stop depends on factors such as the seriousness of the offense suspected, the consequences of delay on the part of the officers, and the likelihood of the detainee's involvement in the offense suspected. Regarding the first factor, this Court has noted many times the gravity of the offense of heroin trafficking in terms of tragic societal costs. *See, e. g., United States v. Oates,* 560 F.2d 45, 59 (2d Cir. 1977). The DEA program in which Agent Whitmore was participating is aimed specifically at couriers, rather than mere drug users, and is aimed particularly at heroin rather than less injurious types of controlled substances. *See id.* at n.11. The fact that a controlled substance other than heroin was discovered in this case does not, of course, reflect on the reasonableness of the stop.

Second, many cases have recognized that the need for a stop increases if the departure of a suspect from the area reasonably appears to be imminent. *See, e. g., United States v. Oates, supra,* 560 F.2d at 59; *United States v. Magda, supra,* 547 F.2d at 759; *United States v. Santana,* 485 F.2d 365, 368 (2d Cir. 1973), *cert. denied,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974). Here the DEA agents did not stop Price as soon as their suspicions were aroused. Instead, they followed Price right to the door of a large apartment building. The agents had no information as to Price's name or address nor any method for obtaining this information without stopping him. In addition, heroin is a "readily disposable commodity." *United States v. Oates, supra,* 560 F.2d at 59. The chances of losing track of Price and the heroin he was suspected of carrying would have increased substantially had Price been permitted to enter the building and thereby end the agents' surveillance.

■ Finally, perhaps the most important and certainly the most contested factor

bearing on the need for the stop was the likelihood that Price was involved in drug trafficking as the agents suspected. The cases emphasize that, as noted above, this likelihood must be measured solely on the basis of specific articulable facts rather than on the mere hunch of an agent.[7] *Terry v. Ohio, supra,* 392 U.S. at 21–22, 88 S.Ct. 1868; *United States v. Oates, supra,* 560 F.2d at 59; *United States v. Magda, supra,* 547 F.2d at 758; *United States v. Garcia,* 450 F.Supp. 1020, 1023–24 (E.D.N.Y.1978); *United States v. Taibe,* 446 F.Supp. 1142, 1146 (E.D.N.Y.1978). At the suppression hearing Agent Whitmore testified that his decision to speak to Price was based on the following observations:

1. Price arrived on a flight from a known "source" city.

2. Price held up the line of disembarking passengers, apparently in order to scan the area before entering the corridor.

3. Price appeared nervous and was observed by Whitmore to be continually scanning the area while he waited for his baggage.

4. Two of the pieces of luggage carried off the plane or claimed by Price lacked identification.

5. After picking up his luggage, Price hurried to obtain a taxi, running across the road, in the rain, to hail a taxi while ignoring a sheltered taxi stand in front of the terminal.

6. Price threw three pieces of luggage into the trunk of the taxi and then "cuddled" the shoulder bag as he placed it on top of the other bags.

7. Both before and after emerging from the taxi, Price scanned the street. Only then did he take his luggage and proceed towards the building.

We reject the government's contention that these observations and the rational in-

---

7. The inarticulate hunch, the awareness of something unusual, is reason enough for officers to look sharp. Their knowledge and experience identify many incidents in the course of a day that an untrained eye might pass without any suspicion whatever. But awareness of the unusual, and a proper resolve to keep a sharp eye, is not the same as an articulated suspicion of criminal conduct. *United States v. Montgomery,* 182 U.S.App. D.C. 426, 430, 561 F.2d 875, 879 (1977).

ferences to be drawn therefrom provided Agent Whitmore with probable cause to arrest Price. However, for the reasons which follow, we hold that these facts and inferences did reasonably warrant the very minimal and brief intrusion upon Price's individual security which preceded his consent to the search of his shoulder bag.

In viewing the observed facts under the reasonable suspicion test, we keep in mind two principles. The circumstances surrounding a stop "are not to be dissected and viewed singly; rather they must be considered as a whole." *United States v. Oates, supra,* 560 F.2d at 61, *quoting United States v. Magda, supra,* 547 F.2d at 758, *quoting United States v. Hall,* 174 U.S.App. D.C. 13, 525 F.2d 857, 859 (1976). In addition, these circumstances "are to be viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Oates, supra,* 560 F.2d at 61, *quoting United States v. Magda, supra,* 547 F.2d at 758, *quoting United States v. Hall, supra,* 525 F.2d at 859. *See also United States v. Wabnik,* 444 F.2d 203, 205 (2d Cir.), *cert. denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 91 (1971).

If viewed in isolation, any one of the factors noted by Agent Whitmore—arriving from Chicago, appearing nervous, continu-ally scanning the faces of the people in the terminal, carrying bags with no identification, handling luggage in an unusual manner, rushing out into the rain for a taxi, scanning the street upon arrival at one's destination—might be unremarkable. However, the combination of factors suffices to satisfy what has been characterized as the "rather lenient" test the Supreme Court has established for a minimally intrusive stop. *United States v. Santana, supra,* 485 F.2d at 368. This is particularly true when Agent Whitmore's training and experience are considered. Whitmore has been with the DEA since its inception in 1973. At the time he stopped Price he had been assigned to monitor flights to and from La Guardia for two years. He personally observed each day almost one thousand passengers arriving from Chicago. He had participated on several occasions in stops of passengers who were in fact carrying heroin.[8] "[S]ome patterns of behavior which may seem innocuous enough to the untrained eye may not appear so innocent to the trained police officer who has witnessed similar scenarios numerous times before." *United States v. Oates, supra,* 560 F.2d at 61. As long as the elements of the pattern are specific and articulable, the powers of observation of an officer with superior training and experience should not be disregarded.[9]

---

**8.** Before stopping Price, Special Agent Whitmore had personally participated in several airport stops that resulted in the discovery of heroin hidden on the person or in the luggage of a courier. *See, e. g., United States v. Rico,* 594 F.2d 320 (2d Cir. 1979) (stop and subsequent search incident to arrest upheld); *United States v. Garcia,* 450 F.Supp. 1020 (E.D.N.Y. 1978) (stop and subsequent consent search upheld); *United States v. Flores,* 462 F.Supp. 702 (E.D.N.Y.1978) (stop and consent search); *United States v. Oyola,* 77 Cr. 579 (E.D.N.Y. Dec. 21, 1977), *aff'd,* 594 F.2d 853 (2d Cir. 1978) (stop and consent search upheld); *United States v. Medina,* 77 Cr. 460 (E.D.N.Y. Nov. 29, 1977) (stop and subsequent consent search upheld). According to Agent Whitmore's testimony at the suppression hearing in the *Rico* case (held in early 1978), the DEA La Guardia team had stopped between 15 and 20 persons in the previous year. Agent Whitmore estimated that about 60 percent of those stopped were found to be carrying contraband.

**9.** The Supreme Court decision in *United States v. Brignoni-Ponce, supra,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607, sheds some light on the types of specific and articulable factors that may support a stop. *Brignoni-Ponce* held that roving border patrols may stop vehicles near the Mexican border and briefly question the occupants when the officers' observations lead them reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country. *Id.* at 881, 95 S.Ct. 2574. The Court detailed several factors that may be taken into account in deciding whether there is reasonable suspicion to stop a car. For example, "[o]fficers may consider the characteristics of the area in which they encounter a vehicle." *Id.* at 884, 95 S.Ct. at 2582. This is not unlike an agent's consideration of the fact that a passenger has arrived from a "source" city. An officer may consider erratic or evasive patterns of driving. *Id.* at 885, 95 S.Ct. 2574. This is not unlike an agent's consideration of a passenger's erratic or evasive behavior in walking through a terminal, waiting for baggage and

Price takes the position that all his observed actions were entirely consistent with innocence. But the obvious truth of this argument does not help his cause. It must be rare indeed that an officer observes behavior consistent *only* with guilt and incapable of innocent interpretation. *See Terry v. Ohio, supra,* 392 U.S. at 22–23, 88 S.Ct. 1868; *United States v. Smith,* 574 F.2d 882 (6th Cir. 1978). In such a situation, there would be far more than reasonable suspicion; indeed, there would be more than the grounds necessary to support a finding of probable cause. Certainty is not a constitutional prerequisite of either an arrest or a stop.

Here, based on his experience and training, Agent Whitmore observed that Price's conduct was unusual in several particulars, which when viewed as a composite by the trained eye, raised the reasonable suspicion that Price was a heroin courier. In our view the factors enumerated rendered reasonable at least some intrusion on Price's personal security.[10]

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal

to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), *citing, inter alia, Terry v. Ohio,* 392 U.S. at 21–23, 88 S.Ct. 1868. "It is now axiomatic that a law enforcement officer has the power, indeed the obligation, to detain a person temporarily for the purpose of interrogating him if the officer reasonably suspects that the detainee has committed or is about to commit a crime." *United States v. Oates, supra,* 560 F.2d at 58–59 (footnote and citations omitted). The principal protection of Fourth Amendment rights will often lie in the imposition of appropriate limitations on the scope of a particular stop. *United States v. Martinez-Fuerte, supra,* 428 U.S. at 566–67, 96 S.Ct. 3074. In the instant case we can find no harassment, no intimidation, no physical restraint, no humiliation and no prolonged questioning. *United States v. Magda, supra,* 547 F.2d at 759;

hailing a taxi. Even "[a]spects of the vehicle itself may justify suspicion." *Id.* By analogy, a consideration of characteristics of the luggage carried by a passenger, for example its failure to carry identification, is appropriate. And the *Brignoni-Ponce* Court emphasized that "[i]n all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Id.*

10. Price challenges the propriety of Agent Whitmore's reliance, in stopping Price, on a DEA drug courier "profile." The profile at issue is an informal, apparently unwritten, checklist of characteristics believed by the DEA to be common to drug couriers utilizing domestic airlines. It appears from the cases that the presence of a number of profile characteristics will alert DEA agents to focus their attention on a particular passenger. If continued observation indicates to an agent that investigation is warranted, a stop will generally be made.

Use of the profile does not obviate the need for traditional analysis. *United States v. Westerbann-Martinez,* 435 F.Supp. 690, 698 (E.D.N.Y.1977). Satisfaction of a number of elements

of the profile does not necessarily satisfy the *Terry* requirement that the intrusion be justified on the basis of specific and articulable facts. *See United States v. Rico,* 594 F.2d 320, 326 (2d Cir. 1979), *citing, inter alia, United States v. Smith,* 574 F.2d 882, 884–85 (6th Cir. 1978), *United States v. Pope,* 561 F.2d 663, 668 (6th Cir. 1977); *United States v. McCaleb,* 552 F.2d 717, 720 (6th Cir. 1977). The reasonableness of a stop must ultimately be determined solely by the reviewing court, and that court cannot be bound by a profile developed by the law enforcement officers whose actions are being reviewed. However, it is appropriate for a court to take into account characteristics enumerated in the profile, which represents "a kind of institutional expertness" derived from the cumulative experience of DEA surveillance teams. *United States v. Rico, supra,* at 326. *But see United States v. Westerbann-Martinez, supra,* 435 F.Supp. at 697–98, and cases cited therein, discussing tendency of profile to change from case to case and noting lack of empirical verification of the accuracy of the profile.

*United States v. Garcia, supra,* 450 F.Supp. at 1023. In our view, the agents acted reasonably both in initiating the encounter and in pursuing it to its conclusion.

## II. *Consent*

 It is well settled that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When the constitutionality of a search conducted pursuant to this exception is challenged, the government bears the burden of proving that consent was freely and voluntarily given. Mere acquiescence to lawful authority or submission to express or implied coercion cannot validate a search. *Id.* at 222, 228–29, 93 S.Ct. 2041; *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Amos v. United States,* 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *United States v. Mapp,* 476 F.2d 67, 77 (2d Cir. 1973). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte, supra,* 412 U.S. at 227, 93 S.Ct. at 2047–2048; *United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). *See also United States v. Faruolo,* 506 F.2d 490, 493 (2d Cir. 1974).

Under the "totality of the circumstances" test, it is appropriate to take into account both the characteristics of the accused (such as youth, education and intelligence) and the details of the interrogation (such as duration and location). Price makes no claim of lack of education, experience or

maturity. He has attended college. He has also had previous experience with the criminal law and thus is not a stranger to police techniques. *United States v. Watson, supra,* 423 U.S. at 424–25, 96 S.Ct. 820. The stop itself was made on the public street, *see United States v. Watson, supra,* 423 U.S. at 424, 96 S.Ct. 820, by officers in plain clothes. No weapons were displayed. The tone of the questioning was conversational. The encounter could not have extended beyond one or two minutes before Price gave his consent to a search of the shoulder bag. Judge Weinstein credited Agent Whitmore's testimony to the effect that Price was advised that if he did not consent the agents would have to go to court to apply for a warrant before searching his luggage,[11] and that no threats were made in order to obtain Price's consent. Finally, Price's disclaimer that the bag was not his and that the agents could do whatever they wanted with it was anything but ambiguous. It clearly signified consent to the requested search of the bag which had been in his exclusive possession at least from the moment he was spotted by Agent Whitmore. *See United States v. Fields,* 458 F.2d 1194, 1196–98 (3d Cir. 1972), *cert. denied,* 412 U.S. 927, 93 S.Ct. 2755, 37 L.Ed.2d 154 (1973) (finding consent to search flight bag on similar facts).

The district court's determination that Price consented to the challenged search was not error.[12] Despite the obvious irony, it is apparent that suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed. *See, e. g., United States v. Gorman,* 355 F.2d 151 (2d Cir. 1965), *cert. denied,* 384 U.S. 1024, 86 S.Ct. 1962, 16 L.Ed.2d 1027 (1966). A finding of consent is a factual finding and is not

---

11. Although knowledge of the right to refuse is not "the *sine qua non* of an effective consent," advice to the accused of his constitutional rights is clearly a factor to be considered in determining the voluntariness of a consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973).

12. As noted above, the district court concluded that the challenged search could also be upheld

as incident to, although preceding, a valid arrest based on probable cause. *See United States v. Riggs,* 474 F.2d 699, 704 (2d Cir.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973). Because we hold that the district court did not err in finding that Price consented to the search of his bag, it is not necessary for us to consider alternative grounds on which the search might be upheld.

**504**

to be overturned unless clearly erroneous. *United States v. Wiener,* 534 F.2d 15, 17 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). Judge Weinstein's conclusion was based entirely on his determination that he believed the testimony of Agent Whitmore at the suppression hearing. "The resolution of such an issue of credibility of course is the classic function of the trier of the facts." *Id.*

The suppression motion was properly denied. The judgment is affirmed.

LUMBARD, Circuit Judge (concurring):

Although I agree that the conviction should be affirmed and with much of my brothers' opinion, I write separately to state my view that Price's consent was not necessary to validate the search of his bag since by that time the DEA agents had probable cause to act. The reasonable suspicion which the majority has found existed on the basis of Price's behavior at and as he left the airport surely matured into probable cause when Price, in response to the agents' inquiry, stated that he had absolutely no knowledge of the bag for which he had shown such solicitous care.

Viewed in the context of his behavior at the airport, Price's professed ignorance of the bag would have appeared to any reasonable person as a transparent attempt at evasion. Considering that weight must also be given to the DEA agents years of experience at observing and uncovering drug couriers, the circumstances of Price's behavior provided ample justification for the agents' search of his bag.