**David M. HINTON, Plaintiff,**

v.

**Detective Michael E. GEARY and Police Officer Frank Luceri, Defendants.**

No. 82 Civ. 1593 (IBC).

United States District Court, S.D. New York.

Aug. 26, 1985.

Jackson & Nash, New York City, for plaintiff; Christopher Rooney, New York City, of counsel.

Frederick A.O. Schwartz, Jr., Corp. Counsel, City of New York, New York City, for defendants; Louise S. Horowitz, Marilyn Richter, Asst. Corp. Counsel, New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Plaintiff brings this action pursuant to the Civil Rights Act, 42 U.S.C. § 1983, seeking compensatory damages from defendants for alleged violations of his constitutional rights. We bifurcated the liability and damages issues; the question of liability was tried to the Court on November 27, 1984 and at its conclusion we reserved decision. The plaintiff filed his post-trial memorandum on March 1, 1985; defendants filed theirs on March 11. We undertake now to render judgment.

### Facts

On October 12, 1979 on Bronxwood Avenue in the Pelham Bay section of the Bronx, New York City, a robbery, rape and mutilation of a 26 year old partially deformed female named Francine Elveson took place on the roof of an apartment building there. (Tr. 83)[1] In pursuit of the perpetrator, the police followed a number of "leads." One such "lead" was designated "the unknown Jamaican." (Tr. 84) This person was suspected after the police were informed by two young boys that two days before the crimes were perpetrated they had seen a man on the same spot on the roof landing where Ms. Elveson's body was later discovered; further, that they had observed him there at a time of day similar to the time when the murder took place. They described him as black, with a goatee and mustache, medium "Afro" (hairstyle), about six feet tall, wearing an army fatigue jacket, and carrying a blanket and a knapsack. One of the boys thought he had a Jamaican accent. (Tr. 85; Ex. F)

According to defendant Detective Geary, who had been assigned as the officer in charge of this investigation, the suspicions of the police were further aroused when a tenant in the same building "indicated seeing an unknown male black on the roof landing—on the roof of said building where the deceased was found—just basically that it was a person not known to them and didn't belong up there, and that was on the 29 of October" (Tr. 91–92; Ex. H) (17 days after the homicide). Based on these reports, a composite sketch was made of the "unknown Jamaican suspect."

Seven months later, at approximately 2:30 P.M. on May 12, 1980, a police officer spotted plaintiff in the vicinity of the scene of the crimes and concluded plaintiff closely resembled the person depicted in the composite sketch. The police officer observed that plaintiff wore an army fatigue jacket, carried a knapsack (Tr. 96), and had a small beard and mustache (Tr. 44). The officer telephoned Detective Geary. Detective Geary in turn called Police Officer Luceri, and the two proceeded in the direction of the suspect. (Tr. 95–96) They approached the plaintiff, and according to the trial testimony of Detective Geary, Officer Luceri "indicated [to the plaintiff that he] was very, very similar to a sketch of— to a person we were looking for as a possible suspect, or maybe even a witness in a crime, and that this individual fit that description very closely, not only as to appearance but as to what he was wearing, and that is the reason why he was being

---

1. Throughout this opinion, the letters "Tr." followed by a number in parenthesis indicates a particular page number in the trial transcript. The same applies to an "Ex." which refers to a specific exhibit.

stopped and spoken to. And he introduced me at some point." (Tr. 98–99; *see* 21–23)

The officers frisked plaintiff Hinton for weapons. (Tr. 21) They noted he did not have a Jamaican accent. According to plaintiff, he gave them permission to look in his knapsack (Tr. 34–35). Officer Luceri then took and brought it to the police station; it was given back to plaintiff after the interrogation. (Tr. 21–22) However, according to Detective Geary, "[t]he knapsack was secure with straps on both sides and it was on his back so I had no immediate concern as to a problem with that." (Tr. 103)

Plaintiff was given his *Miranda* rights (Tr. 23). The officers told him that jewelry was missing from the victim of the crime they were investigating. (They did not tell plaintiff that homicide ensued.) When they asked plaintiff where he resided he said, "up the block" (a few blocks away). (Tr. 26) The officers asked him if he would have any objection to the officers searching plaintiff's apartment for the jewelry. (Tr. 99–100) Detective Geary testified:

> Mr. Hinton at that point asked me—asked us if he had to do this, and we said no, that we were not compelling him to do anything, it was his free will. It would assist us, it would clear him if he had nothing to do with this, it would certainly make my job easier, and if his intent was to get us, so to speak, off his back, like he had stated earlier, that would certainly be a way to do it.
>
> I told him that if he refused that I would attempt to get a court order to search the premises.
>
> He told me that wouldn't be necessary, that he has nothing to hide, and that if I promise not to mess up the apartment, that he would be happy to let us in to look for the jewelry.

(Tr. 102) Plaintiff, on the other hand, testified that no one told him that he had a right to refuse to allow the apartment search, and "if I didn't let them in they would send me to Riker's Island until they able to get, how could you say, the court order saying they got the permission to

search it." Plaintiff also testified that he told the officers that he thought they needed a warrant. (Tr. 26–28) However, on cross-examination, in response to the question: "Isn't it the fact that the reason you agreed was because you wanted to clear your name, to show them that you had no jewelry ... in your room?" plaintiff responded: "I did, I did." (Tr. 38)

The apartment search revealed no jewelry from the Elveson homicide. The officers found jars filled with plaintiff's saliva and urine and books containing pornographic material. They also discovered plaintiff's army discharge papers, which indicated that plaintiff's blood type was "O." (Tr. 105, 136; Ex. 5) About that time the officers further informed plaintiff that the crime they were investigating involved not only a robbery but that the victim had also been assaulted and bitten. (Tr. 43)

At the conclusion of the apartment search the officers asked plaintiff to accompany them to the police station for further questioning. (Tr. 108) They explained that since plaintiff had indicated that he worked in the vicinity, they thought he might be able to provide information leading to discovery of the perpetrator of the crimes. (Tr. 109) They also informed plaintiff that they wanted to take him to a dentist's office to have molds of his teeth taken because (according to Detective Geary) there was

> one positive way of identification in this case and that's the teeth. There are no witnesses to the case and there's only one way that this can be accomplished, and the teeth will either make you the person who committed the crime or it will eliminate you completely. If that's the case, which you are claiming it is, we would have no reason at all to ever speak to you again.

(Tr. 108–09)

According to plaintiff, he was taken to the station house, was asked questions and photographed. (Tr. 30–31) On cross-examination, in response to the question: "Isn't it a fact that you agreed to go to the police station with them because you believed

that that was how you would clear up the matter?" plaintiff answered, "I did." (Tr. 42)

The dentist, Dr. Arthur Goldman, was available within a short period of time after plaintiff arrived at the station house. According to Detective Geary:

Mr. Hinton had expressed his concern about going to the dentist and I informed him that he was not—it was not something that he had to do, we were not forcing him to do it, he could refuse. But I also informed him that I would do my best to get a court order to force the issue if I had to go that far. I informed him that it was a painless procedure and that we would get it done as quickly as possible and have him back at his house as fast as we could.

(Tr. 108) The detective further testified:

[T]he plaintiff's statement was, will this clear me totally? If I do this and the teeth come back as I'm not the one, the teeth molds, will you then leave me alone, and I said certainly, there's no reason to come near you again. If you're not the person that we are looking to, we will have no reason in the world to bother you.

That was his main concern, he wanted to clear his name, number one. He didn't want anybody to think that he would be involved in anything of this nature. Number two, he wanted to know how long it would take...

Plaintiff, on the other hand, testified that he was never told that he had a right to refuse to go to the dentist. (Tr. 31)

Dr. Goldman was concerned that plaintiff's submission to the bite mold be voluntary. At trial, Detective Geary stated that Dr. Goldman

asked me if it was totally voluntary, and I told him it was, because I knew Mr. [sic] Goldman's philosophy on that, and I knew he would not allow it any other way ... and I said yes, it was, he's voluntarily coming....

.    .    .    .    .

But I knew Mr. [sic] Goldman would go into it in great detail, which he always did, and we had been to him a few times prior, quite a few times.... Dr. Goldman called us inside into his private office where Mr. Hinton sat down facing Dr. Goldman, and Frank stood behind him, Luceri, and Mr. [sic] Goldman went into the reading of the consent form.

.    .    .    .    .

At that point Dr. Goldman informed Mr. Hinton for the first time to my recollection that it was a homicide that we were investigating and that the victim in fact, who had been bitten, was dead. And that it was a murder investigation....

After that was explained, Mr. Hinton— if he asked a question I don't remember, it's possible he did, but I just don't remember whether he did or not, anyway, he signed the consent. Dr. Goldman asked us to witness it and I signed and Luceri signed, and then Mr. Hinton went with the doctor into another room.

(Tr. 111–13)

Plaintiff agreed that he signed the consent form, but he testified that he did not understand all of it; specifically, he did not know what a homicide was. He said that he asked the officers what was meant by that word and they told him there was nothing to worry about. (Tr. 32) Significantly, at his deposition, plaintiff questioned not the meaning of the word "homicide" but rather who the victim was. (Tr. 49)

In addition to the bite molds, x-rays and photographs were taken of plaintiff's teeth. Subsequently the officers drove plaintiff back to his residence. (Tr. 114) The time was approximately 6:00 P.M. (three and one half hours after plaintiff first had been stopped). The bite molds conclusively established that plaintiff was not the perpetrator of the Elveson homicide.

Plaintiff claims that his initial stop and all of the subsequent activities—the search of his apartment, taking him to the station house and the impressions taken of his

teeth—violated the fourth amendment of the Constitution in that they constituted unreasonable searches and seizures.

### Law

Ordinarily, a search and seizure by a government agent without a warrant issued upon probable cause is a violation of the fourth amendment's prohibition of conducting unreasonable searches and seizures. However, the Supreme Court has carved out several exceptions to this general rule, two of which we firmly believe are applicable herein. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

### I. The Initial Stop

■ The first exception concerns a "stop and frisk" situation. Police officers have authority to stop a person on the street and inquire as to his or her identity and reason for being there, without frisking, provided there are "articulable" grounds for suspicion. *United States v. Price,* 599 F.2d 494, 499 (2d Cir.1979). Further, the officers may frisk the person "where [they have] reason to believe that [they are] dealing with an armed and dangerous individual, regardless of whether [they have] probable cause to arrest the individual for a crime.... And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience...." *Terry v. Ohio,* 392 U.S. at 27. *See also United States v. Oates,* 560 F.2d 45, 58–59 (2d Cir.1977).

■ There is no dispute that the instant plaintiff was "stopped and frisked." However, we do not hesitate to conclude that the police officers had reasonable suspicion to believe plaintiff might be the perpetrator of the Francine Elveson robbery, rape, mutilation and homicide. As Detective Geary testified, plaintiff resembled the composite sketch of the suspect and

> he might possibly have been the person on the roof landing because of the knap-

sack, because of the green army jacket, which you don't find many people walking around with a knapsack and a green army jacket on, of his indication to us of his own conversation that he did pass the place of occurrence of the homicide at almost the same time that the homicide took place, of his indication to us that he did stop girls in the street and attempt to talk to them. There was enough to case, with or without the Jamaican accent, that it should be looked at further.

(Tr. 127) Indeed, plaintiff, when asked on cross-examination whether he told the police officers at the station house that he agreed he resembled the composite sketch, responded: "Well, to say certain features we do have." (Tr. 45)

Accordingly, we find defendants had reasonable suspicion to believe plaintiff might have been the brutal murderer of Ms. Elveson, and thus their "stop and frisk" was completely warranted and fully justified. Furthermore, under the circumstances, the officers had more than the requisite "articulable" reason to make inquiries of plaintiff. Consequently, we are compelled to conclude that the stopping, inquiring and frisking of plaintiff did not rise to the level of a fourth amendment constitutional violation.

### II. The Subsequent Conduct of Defendants

We now turn our inquiry to the constitutionality of the search of plaintiff's apartment, taking plaintiff to the station house, and obtaining bite molds of plaintiff's teeth.

■ It is well established that "one of the few specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth, supra,* 412 U.S., at 219, 93 S.Ct. at 2043; *United States v. Price,* 599 F.2d 494, 503 (2d Cir.1979). When the constitutionality of a search conducted pursuant to this exception is challenged, the police officers bear the burden of proving that consent was freely and voluntarily given. *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319,

1324, 75 L.Ed.2d 229 (1983); *United States v. Price, supra,* at 503.

Plaintiff argues that he did not voluntarily consent; that the police officers threatened to lock him up on Riker's Island until they obtained a search warrant if he did not go along with them, and thus his agreement was coerced. Detective Geary denies ever having threatened to transport plaintiff to Riker's Island if he did not consent. Rather, he testified that, had plaintiff not consented, the detective:

> would have let him walk away but ... I would have placed him under surveillance.... [That is] I would have had people watching him discreetly from a distance, watching his apartment, watching his building, following him in essence so that we know where he was at all times until I could attempt to get the court order and get a negative or positive response. [If he had refused to consent to the taking of impressions of his teeth, I would have done] [t]he same thing. Same procedure. I would have tried to get a court order. I couldn't force him to do it...

(Tr. 116–17)

Indeed, this very procedure was followed with respect to another suspect, confidentially called by initials assigned to him, who refused to have bite molds taken. The police department "decided to go ahead and obtain a—try and obtain a court order to force the subject to let us take—have the teeth molds taken and while this process was going on he was placed under 24 hour surveillance by the Police Department." (Tr. 121)

On the basis of both his testimony and general demeanor, we found Detective Geary to be an extremely impressive and positively credible witness; we adopt his testimony in full. We were far from convinced and persuaded by the testimony and overall deportment of plaintiff. We found him totally unconvincing. Consequently, we find no hesitation whatever in concluding that the version of the police officers as to what took place between them and plaintiff from start to finish bears the hallmark of positive truth. We find that plaintiff's consent to all the procedures followed was, as plaintiff admitted time and time again at trial, to clear his name. This was best summed up on cross-examination of plaintiff:

Q: Mr. Hinton, isn't it a fact that, for example, you agreed to the search of the room because Detective Geary told you that if you didn't agree then that he would come back later with a warrant so you agreed to get done with it?

A: I did there.

Q: And isn't it a fact that when they told you they wanted you to come to the police station so they could photograph you and check you out, again to clear up the matter of your identity once and for all, you agreed to go along so that they wouldn't have to come back later?

A: You could say I did.

Q: And isn't it a fact that also ultimately you agreed to go to the dentist because Detective Geary explained to you that the one way you could clear yourself from any suspicion of the assault on the girl was to have molds of your teeth taken which would clear you once and for all, isn't that true?

A: You could say they did.

(Tr. 57)

■ Our determination is not in any way lessened by plaintiff's lack of education and apparent low intelligence. *See Schneckloth, supra,* 412 U.S., at 226, 93 S.Ct. at 2047. The question whether a consent to a search was in fact voluntary or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances. *Schneckloth, supra,* at 227, 248–49, 93 S.Ct. at 2047, 2058–59; *United States v. Price, supra,* at 503. In the instant case plaintiff knew he was not under arrest (Tr. 42), was given his *Miranda* rights, was detained for no more than three

hours (including the time in which the bite molds were taken), there is no claim of prolonged and repeated questioning, and plaintiff was neither physically punished nor deprived. *See United States v. Mendenhall*, 446 U.S. 544, 557–59, 100 S.Ct. 1870, 1878–80, 64 L.Ed.2d 497 (1980); *United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976); *Schneckloth*, 412 U.S., *supra*, at 226, 93 S.Ct. at 2047. In short, we find that plaintiff, in his eagerness to exonerate himself, voluntarily consented to have his apartment searched, accompany the police officers to the station house, and have impressions taken of his teeth. It is our conclusion that Mr. Hinton's constitutional rights were in no way violated during this police investigation.

Plaintiff makes several additional arguments none of which we find persuasive. He first contends that he did not understand what the word "homicide" meant and had he understood he might not have consented to the bite molds procedure. We disregard this argument in light of the fact that this issue did not seem to confuse him at the time the impressions were taken and the testimony by Detective Geary that the meaning of this was specifically spelled out to plaintiff by the dentist, together with plaintiff's right to refuse, before he signed the form.

Plaintiff next argues that defendants should have known plaintiff was not the suspect when they found his army discharge card in his apartment revealing that his blood type was "O" and as the officers knew, the blood type of the person who had murdered Ms. Elveson was "A." However, as stated by Detective Geary:

> I cannot take the word of a piece of paper. I don't know who wrote that. There are human beings that write it. They make mistakes.

(Tr. 137) Furthermore, the police were looking for someone who raped and murdered in an extremely perverse and ob-

scene manner. In the search of plaintiff's apartment, in addition to finding plaintiff's army discharge card, defendants found jars containing plaintiff's saliva and urine as well as pornographic material. If anything, that disclosure in the course of the search must have heightened their suspicions. Indeed, it is our opinion that in light of all the circumstances, had the police abandoned their investigation of plaintiff because of the blood type reported on the army discharge card, they would have completely abandoned their public responsibility.

In short, each and every one of plaintiff's arguments is totally absent of merit.

*Conclusion*

In accordance with the foregoing and on all the proceedings heretofore had herein, we find no violation of plaintiff's fourth amendment rights. We dismiss the complaint in its entirety.

SO ORDERED.