**UNITED STATES of America, Plaintiff,**

v.

**Donato IOVINE, Defendant.**

**No. 77 CR 540.**

United States District Court,
E. D. New York.

Jan. 10, 1978.

David Trager, U. S. Atty., Brooklyn, N. Y. (Douglas K. Mansfield, Brooklyn, N. Y., of counsel), for plaintiff.

Richard Rozenkranz, Brooklyn, N. Y., for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendant has moved to suppress seventy-two cases of Dewars Scotch whiskey which were found by a Federal Bureau of Investigation ("FBI") agent in a blue Chevrolet step van owned by defendant and parked on the street in front of his residence. The sole question is whether defendant gave a valid "consent" to the FBI search of the step van.

A hearing was held, and three FBI agents in addition to defendant testified. In substance the agents testified as follows. On September 13, 1977, Agent Patrick F. Colgan observed defendant driving in a white Ford camper from his residence at 22 Preston Court, Brooklyn, to Glenwood and Utica Avenues, Brooklyn, where he got out and gave the keys to the camper to one Louis Cinqueranna. At that point Colgan identified himself and asked to talk to the two men. Within seconds other agents appeared, and separate conversations with the two men were held on the street.

Cinqueranna produced a registration for the camper and gave permission to search it, whereupon thirty cartons of untaxed cigarettes were found. On request defendant produced identification, and after some conversation was asked whether he would consent to a search of his residence. He replied that he did not own or lease the premises but his "common law" wife did, and that she would probably consent.

Defendant was then driven to the residence. He was not under arrest and was not handcuffed. When defendant and the agents arrived defendant's wife became enraged at him for having involved her in something which occasioned the presence of FBI agents. Agent Milton E. Ahlerich calmed her down, told her that the FBI was investigating defendant in connection with some stolen liquor, and requested permission to search the premises. A written form of consent was prepared, and, after consulting with the defendant, she signed it.

Thereafter defendant and two agents stepped into the rear yard of the premises and continued their conversation. Colgan, who had remained outside, approached them and asked defendant if he was the owner of the blue Chevrolet step van parked on the street in front of the residence.

Defendant said the vehicle was his and asked Colgan if he wished to inspect it. Colgan then told defendant that he had a right to insist on a search warrant before a search was made, but defendant replied that this would not be needed. He thereupon reached into his pocket and obtained a set of keys which he offered to Colgan, who refused them and asked defendant to walk with him to the step van and open it. The two then walked over to the step van; defendant unlocked it; and Colgan observed seventy-two cases of Dewars scotch.

Defendant claimed that two of his friends had used the vehicle the previous day and must have left the whiskey in it. He refused to divulge the friends' names, asserting that reprisals might be taken against him or his family. Soon, however, defendant admitted that he had received seventy-seven cases of whiskey and had delivered five that day, so that there should be seventy-two remaining in the step van. He was thereupon placed under arrest.

The question is whether the search of the step van violated defendant's rights under the Fourth Amendment, which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The government seeks to justify the search on the basis of defendant's "consent", and says that it has the burden of proving that such "consent" was "voluntarily" given. *Bumper v. State of North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

As Mr. Justice Harlan once observed, the decisions of the Supreme Court with respect to the Fourth Amendment "are hardly notable for their predictability." *Ker v. California,* 374 U.S. 23, 45, 83 S.Ct. 1623, 1646, 10 L.Ed.2d 726 (1963)(concurring opinion). Searches and seizures are indeed "an opaque area of the law," Powell, J., concurring in *Schneckloth v. Bustamonte,* 412 U.S. 218, 269, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), perhaps because the Fourth Amendment prohibits only "unreasonable" searches and thus explicitly invites the balancing of conflicting but unspecified interests.

Where "consent" to a search is claimed, the uncertainty in the decisions has been compounded because the terms upon which the debate has been carried forward have obscured rather than clarified the considerations at stake. The question has traditionally been framed as to whether the consent was "voluntary" or "coerced", as if these terms were mutually exclusive. *Bumper v. State of North Carolina, supra,* 391 U.S. at 548, 550, 88 S.Ct. 1788. But as Mr. Justice Stewart recognized in *Schneckloth v. Bustamonte, supra,* at 224, 93 S.Ct. 2041, at least where the defendant has his wits about him, a consent is almost always "voluntary" in the sense that it represents an exercise of the will to make a deliberate choice among alternatives. Indeed, a consent to a search made in apprehension even of the continuation of the infliction of bodily harm is in the fullest sense the result of a rational and "voluntary" choice. By the same token, "coercion", though it carries overtones of physical force or violence, has been used to describe activities falling far short of that. *Bumper v. State of North Carolina, supra,* 391 U.S. 548–550, 88 S.Ct. 1788 and cases cited.

To make the result turn on whether the consent is "voluntary" is thus to ask that word to bear far more than its natural meaning and to use it to label the result of an assessment of considerations often having little if anything to do with whether the defendant has made a conscious and intelligent choice. Instead of pouring unnatural content into the word "voluntary" it would aid analysis if courts were simply to identify the interests at issue and to weigh them frankly in the scale which the Fourth Amendment provides, namely, that of unreasonableness.

█ The opinion in *Schneckloth v. Bustamonte, supra,* while it adheres to the traditional verbal formula by characterizing the issue as one of "voluntariness", has addressed itself to the values which must be accommodated where police seek consent to make a search. The Fourth Amendment was designed to protect the security of one's privacy against unreasonable intrusion by the police, and to reflect "the concern of our society for the right of each individual to be let alone." 412 U.S. at 242, 93 S.Ct. at 2056. To be weighed against that concern is the indubitable need for police investigation if crimes are to be

solved. But where that function is carried out in such a way as to lead to "the possibility of unfair and even brutal tactics" then "a real and serious threat to civilized notions of justice" is posed. 412 U.S. at 225, 93 S.Ct. at 2046.

■ It is thus the arbitrary and unreasonable activities of the police against which the Fourth Amendment protects. In most "consent" cases we begin, in other words, with an examination of what the police did and not with the "voluntariness" of the defendant's choice, though his state of mind, taking into account such factors as his age, his intelligence, and his experience, if any, with the law, is relevant because it bears upon whether the actions of the police are "fair." In short, if we are to respect the values embodied in the Fourth Amendment, where consent is obtained by "unfair" or "brutal" or "uncivilized" means, the search is "unreasonable" whether or not the consent is the product of a rational and therefore "voluntary" choice. Such a formulation may be vague, but in a related though quite different context the Supreme Court has succeeded in giving specific content to an equally general question, namely, what process is "due" under the Fifth and Fourteenth Amendments. See, e. g., *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The same could be done with respect to the Fourth Amendment.

■ Because the question is what is "reasonable", the temptation is great to disclaim the ability to frame any meaningful criteria and to take refuge in the ancient formula that the ultimate determination "is a question of fact to be determined from all the circumstances." *Schneckloth v. Bustamonte, supra,* at 248–249, 93 S.Ct. at 2059. But the lower courts have no such luxury, for they must try as best they can to follow the decisions of the Supreme Court and perforce must attempt to discern some principles by which conduct is to be judged. For the purposes of deciding this case, where defendant was in full possession of his faculties, it is enough to conclude that unless the FBI obtained the consent by fraud or threat of force or dire consequences, unless in short the government has played an ignoble part, the consent was valid and the search was "reasonable."

That much can be distilled from the recent Supreme Court opinions. The police tactic which the Court has deemed most obviously "unfair" is to threaten to use force. *Schneckloth v. Bustamonte, supra,* at 228, 234, 235, 93 S.Ct. 2041, and cases cited. But "more subtle forms of coercion" such as implications that unspecified but serious consequences will follow if consent is withheld have also been thought obnoxious. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). A consent obtained by the fraudulent or mistaken claim of lawful authority to conduct the search has likewise been decided to be invalid. *Bumper v. State of North Carolina, supra.*

But the fact of custody has been held not in itself to invalidate a consent to search a vehicle where the defendant is warned that anything found may be used against him and his consent is given while on a public street and not in the confines of a police station. *United States v. Watson, supra.* It has even been decided that the prosecution is not required affirmatively to show that defendant knew he had a right to refuse consent to search a car, where the consent is granted "casually" on a public street in the course of a "very congenial" conversation with the police. *Schneckloth v. Bustamonte, supra.*

These decisions leave no doubt as to how the case at bar should be decided. The FBI applied no unfair or brutal or uncivilized tactics. They did not obtain the consent by fraud or force or threat of force or claim of authority to conduct the search. While the defendant testified that he was thrown up against the Ford camper, I find that no such thing occurred. Indeed, I find the FBI agents' testimony wholly believable in every important particular.

In contrast, I find the testimony of defendant unworthy of belief insofar as it related to the critical issues. He admitted lying to the FBI. In response to questions

by the Court he stated that he did not know that the cases of whiskey were in the step van, a statement he repudiated when he was recalled to testify by his attorney.

Based on all the evidence and particularly on the testimony of Agent Colgan I find that defendant was not under arrest when he gave his consent, that when asked if the step van was his he replied in the affirmative and inquired of the agents if they wished to inspect it, that he was thereupon informed that he had a right to insist that they obtain a search warrant, and that he replied that this would not be necessary. I further find that defendant took the keys from his pocket and offered them to Agent Colgan, who refused to take them and asked defendant to walk with him to the step van and open it, and that defendant complied.

Defendant contends that when he was informed of his right to insist on a search warrant he should also have been advised that a warrant would not issue unless a judicial officer found probable cause. There is no merit to this contention. Defendant was advised of his right in a way which made it clear that a warrant would be a protection to him. He was no stranger to the law. He admitted on direct examination to a conviction for gambling. The advice was certainly not conveyed to him in terms which could have given him the impression that no proof of probable cause would be required to obtain a warrant. Under the circumstances the FBI plainly was not required to detail for him the legal prerequisites to a warrant. *United States v. Curiale,* 414 F.2d 744 (2d Cir. 1969).

Defendant also urges that the fact that the agents received written consent to search the premises from his wife and obtained no such writing from him with respect to the step van indicates that in fact no oral consent was given. As I have noted, I believe Agent Colgan's testimony that oral consent was in fact given. Moreover, in the context in which the conversation concerning the step van took place it seems to me perfectly plausible that no writing would be asked.

Finally, the question remains as to why defendant would have consented to a search of the step van when he knew it contained the stolen whiskey. It is suggested that any consent by him would have been wholly irrational and that therefore it is unlikely to have been granted. However, the evidence shows that on the discovery of the whiskey by Agent Colgan defendant at first contended that his friends had used the truck the day before and must have left the whiskey in it. If defendant had any hope of persuading the FBI of the truth of this story, it would have been eminently rational for him to give consent to a search rather than to insist on a warrant. He might well have believed that only consent would be consistent with lack of knowledge of the presence of the whiskey.

The motion to suppress is denied. So ordered.