**UNITED STATES of America**

**v.**

**Leonard D. MORRIS a/k/a "Leonard Spigna", and Charles Morris, a/k/a "Bunny", Defendants.**

**No. 78 CR 63.**

United States District Court, E. D. New York.

June 5, 1978.

Martin Erdman, The Legal Aid Society, Federal Defender Services, New York City (Phillip Katowitz, New York City, of counsel), for Leonard D. Morris.

Robert Bloom, New York City, for Charles Morris.

David G. Trager, U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Glenn B. Kritzer, Asst. U. S. Atty., of counsel), for the United States of America.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Defendants Leonard Morris and Charles Morris, indicted for armed bank robbery in violation of 18 U.S.C. § 2113, have each moved to suppress certain oral statements.

Leonard Morris asserts that he was arrested without probable cause and that his statements should be suppressed as the "fruit" of the illegal arrest. Charles Morris likewise contends that his statements were the "fruit" of an illegal arrest. He also claims that he was not given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and was refused a lawyer before making the statements and that in any event they were coerced.

From the testimony given at a hearing the court makes the following findings.

On the morning of January 19, 1978 Detective Anthony DeGise of the New York City Police Department was waiting in a police vehicle with Detective Allen Hooker in the vicinity of Van Tuyl and York Streets, Staten Island. They were seeking Charles Morris, who was wanted for a burglary committed in 1977 and was the subject of a "wanted" card on file with the New York City police department. Some time after noon a black car, which, as the officers had been informed, was being operated by Charles Morris and in which Leonard Morris was a passenger, came towards the police.

When Charles Morris recognized the police vehicle, he made a sudden stop and a U-turn, and sped rapidly away. The officers gave chase but the black car eluded them, and they radioed ahead to Sergeant Carney and Detective Wilk who took up pursuit.

After some blocks Charles Morris stopped his car, got out and ran. Carney and Wilk drove up to the black car, Carney got out, and Wilk drove on towards Charles Morris. When Wilk caught up with him he was attempting to climb up an embankment into an empty lot. Wilk stopped the police car and with his revolver drawn stepped out. As he did so Wilk slipped on the ice, and the revolver accidentally fired into the air. Charles Morris turned around and on orders from Wilk came down the embankment with his hands up and was arrested.

Back at the black vehicle Carney placed Leonard Morris under arrest. However, the precise circumstances of that arrest are unclear. There was hearsay evidence testified to by one of the detectives that Carney had ordered Leonard Morris out of the car, that he had refused, holding the car door shut, and that Carney had then apprehended him for that refusal. A detective also testified that he saw Carney "pulling" at the door of the car, but did not see or hear Carney make the arrest.

The official police report of the accidental discharge of Wilk's revolver gives a different version, reciting that both Morrises got out of the black car before Carney and Wilk reached it. Neither Carney nor Wilk testified.

There was no "wanted" card outstanding for Leonard Morris, and the only theory on which the detectives sought to justify his arrest was that he had obstructed governmental administration by disobeying Carney's order to vacate the car and thus had impeded Carney's immediate search of the car for guns he believed were in it. The government therefore had the burden of establishing that Leonard Morris had indeed refused to get out of the car. *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States ex rel. Mungo v. LaVallee,* 522 F.2d 211, 215 (2d Cir. 1975), *vac. on other grounds,* 428

U.S. 907, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976); *United States v. Elgisser*, 334 F.2d 103, 110 (2d Cir. 1964), *cert. den. sub nom., Gladstein v. United States*, 379 U.S. 879, 85 S.Ct. 148, 13 L.Ed.2d 86 (1964).

 The court may, of course, consider hearsay on this issue. Rules 104(a) and 1101(d)(1) of the Federal Rules of Evidence. But the hearsay evidence was conflicting. The statement in the official report of the firearms discharge that Leonard Morris was outside the black car when Carney arrived is just as believable and plausible as the hearsay recounted by the detective. The government, which could have called Carney and Wilk to testify, has thus failed to sustain its burden, and the court decides the case on the basis that Leonard Morris was unlawfully arrested.

After the Morrises were arrested the detectives took them to the 122nd precinct in Staten Island, where they arrived at about 1:30 P.M. Shortly thereafter DeGise read the *Miranda* warnings to Charles Morris, who said he understood them and agreed to talk. He did not ask for an attorney. However, DeGise, who had other work to do, did not commence the interview immediately but returned after 4 P.M., took Charles Morris from the holding pen, and again read off the *Miranda* warnings. Again Charles Morris said he understood them and did not ask for an attorney. When he said he would give a statement as to the robberies in which he participated, DeGise put a piece of paper into the typewriter and proceeded with the questioning.

Charles Morris then admitted to the commission of five Staten Island robberies, in two of which (Acme Supermarket and Savon Drugs) he said Leonard Morris had participated. After the typing was complete DeGise gave the paper to Charles Morris. He refused to sign an admission of all five robberies and said he would "sign for" only one, a robbery of an ice cream store on Richmond Terrace. DeGise then typed up another paper reciting that Charles Morris admitted to robbing the ice cream store in October 1977. DeGise stapled to the paper a pink slip containing the

*Miranda* warnings and asked Charles Morris to sign the statement and initial the warnings. He did so some one and a half hours after the interview began.

After the signing DeGise asked about bank robberies, and Charles Morris answered that he had robbed only the Community National Bank in Staten Island, that he had done it with Leonard Morris and another man, and that they had obtained $93,000. He then agreed to talk to the Federal Bureau of Investigation ("F.B.I.") about this robbery. The F.B.I. was thereupon notified.

In the meantime, at about 4:30 P.M. Detective George Siersema removed Leonard Morris from the holding pen. Before doing so, however, Siersema had shown to a witness of the Acme Supermarket robbery a photo spread from which she identified Leonard Morris as one of the perpetrators.

Siersema read to Leonard Morris the *Miranda* warnings and had him sign a pink slip on which they were printed. He acknowledged that he understood them and said he was willing to answer questions. After some colloquy he agreed to confess but only as to the Acme Supermarket robbery. Siersema typed up such a confession, and Leonard Morris signed it within a half hour of the commencement of the interview.

After the statement was signed Siersema said he believed Leonard Morris had committed bank robberies and asked if he would speak to the F.B.I. He agreed.

F.B.I. agents Matthew Tricorico and Frank Spero arrived at the precinct soon after 8 P.M. They were told that Charles Morris had already confessed to the Community National Bank robbery. They then met and advised him of his *Miranda* rights. He acknowledged that he understood them and said he was willing to talk about the bank robbery. But then he hesitated slightly and said "maybe I should talk to a lawyer."

Tricorico responded "[t]hat's your choice" but "[y]ou're the guy that requested" the F.B.I. to come. It was then snowing heavi-

ly outside, and Tricorico said "I just don't believe that we came all the way out here for this", and "[y]ou're going to have to make up your mind." With that he went out of the room and asked DeGise what the story was since the F.B.I. had supposed the matter was "all cut and dried" and "now he's telling me that he's not sure whether he wants to talk to us."

DeGise then reentered the room and told Charles Morris that he had already confessed to the Community National Bank robbery, that DeGise could testify to that confession, that Charles Morris had requested that the F.B.I come to talk to him because he had an interest in going into Federal custody, and that he should make up his mind whether he would talk. He then agreed to talk.

He proceeded to admit to the bank robbery and at about 9 P.M. signed an F.B.I. "waiver of rights" form and thereafter a three page confession, which stated that Leonard Morris while armed had also participated in the robbery.

F.B.I. agents Carrig and Scott arrived at the precinct some time after 10 P.M. and were told by a detective that Leonard Morris wished to talk to them after conferring with Charles Morris. The Morrises were then placed together in the pen.

Some time after 11 P.M. Carrig and Scott began to interview Leonard Morris. They read to him the *Miranda* warnings. He agreed to waive his rights and signed an F.B.I. waiver of rights form. He then confessed to the robbery of the Community National Bank and to the attempted robberies of two other banks, naming Charles Morris as a participant in each of the crimes.

## I

Leonard Morris contends that his statements are inadmissible because they are the "fruit of the poisonous tree" of the illegal arrest.

By the Fourth Amendment to the United States Constitution the violation of the "right of the people to be secure in their persons . . . against unreasonable . . . seizures" is prohibited. As the courts long ago decided, the only effective way in which unreasonable searches and seizures in violation of the Fourth Amendment can be deterred is to suppress evidence obtained as a result of those violations. *United States v. Garcia*, 450 F.Supp. 1020 (E.D.N.Y. decided May 4, 1978); *United States v. Iovine*, 444 F.Supp. 1085 (E.D. N.Y.1978). The consequence has been that some of those who are undoubtedly guilty go free because relevant and reliable proof may not be used against them. But that is the price which must be paid to discourage improper arrests of the innocent.

However, this deterrent purpose has never been carried so far as to bar all evidence which would not have been uncovered "but for" the improper actions of the police. The suppression of all evidence to the discovery of which an illegal search or seizure may have conceivably contributed might indeed restrain violations of the Fourth Amendment. But causation is a web not a chain, and such a rule would exact a disproportionate cost in the enforcement of the criminal law.

Therefore the Supreme Court has held that statements taken from someone unlawfully arrested will be excluded only if they were elicited "by exploitation of that illegality." *Wong Sun v. United States*, 371 U.S. 471, 487–488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois*, 422 U.S. 590, 599, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). That holding preserves the exclusionary rule's deterrent effect upon the police in instances where they have the greatest temptation to disregard the Fourth Amendment but does not frustrate the purposes of the penal law merely because there is a logical though remote or minor connection between the illegality and the evidence obtained.

Leonard Morris was unlawfully arrested at 1:30 P.M., and while in police custody he admitted, some time after 4:30 P.M., the robbery of the Acme Supermarket and, some time after 11 P.M., the bank robberies. However, before he was questioned a

witness to the supermarket robbery had identified him to the police as a perpetrator. That identification gave the police probable cause to arrest and hold him. The question for the court is whether under these circumstances the deterrent effect of suppressing his statements is outweighed by the cost to the enforcement of the law.

Certainly if we follow literally the test articulated by the Supreme Court in the *Wong Sun* and *Brown* cases, namely, whether the confession is the result of an exploitation of the arrest, there can be little doubt as to the answer. The identification of Leonard Morris by the witness to the supermarket robbery, having been made before he was questioned, in no sense stemmed from his arrest. Thus if the police had, before questioning him, released and later rearrested him, a statement by him would under the *Wong Sun* case not have been considered the product of an exploitation of his initial arrest. 371 U.S. at 491, 83 S.Ct. 407.

■ It follows that once he was subject to a lawful arrest his later statement cannot be deemed the result of the exploitation of an earlier unlawful arrest. And this is so even though he was held in continuous custody.

It would be absurd to demand that where the police have ample grounds to hold a suspect they may take no statement but must let him go and thereafter take him into custody again. Such a requirement would simply afford the suspect the opportunity to flee, and it can hardly be the policy of the law to allow someone who is properly subject to arrest a sporting chance to escape.

It is true that conceivably the police might seize suspects without probable cause for the purpose of holding them while an attempt is made to develop evidence from another source warranting their further detention. But the temptation to make an invalid arrest is greatest if the arrest itself is allowed to yield proof of guilt. The motive for an arrest without probable cause can hardly be strong if the police must thereafter secure independent evidence of the commission of the crime. Particularly is this so in the light of the requirement that those charged with crime be promptly arraigned. In short, the suppression of statements made under the circumstances of this case would at best be a dubious deterrent not justified by the cost it would exact in the administration of justice.

The court holds that the statements made by Leonard Morris should not be excluded as the fruit of an unlawful arrest. A similar holding appears to have been made in *Ramsey v. Zelker*, 356 F.Supp. 275 (S.D. N.Y. per Frankel, J.), aff'd 480 F.2d 916 (2d Cir. 1973).

## II

■ Charles Morris likewise contends that he was unlawfully arrested. But the evidence shows and the court finds that the police had probable cause to apprehend him.

When they first sought him in the black car he had been charged with an earlier burglary and a warrant alarm had been transmitted, and a "wanted" card had been placed on file by a detective Mercer. Though the wanted card had not been found at the time of the hearing, there is no reason to doubt that it had existed and had been filed. Nor is there any basis for questioning the *bona fides* of the officers who relied on the earlier charge and the wanted card to justify the arrest.

In addition, the actions of Charles Morris in endeavoring to evade the police gave them increased reason to effect his arrest. *Brinegar v. United States*, 338 U.S. 160, 166 n. 7, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

Charles Morris further claims, and testified, that DeGise never advised him of his *Miranda* rights and refused to allow him an attorney. The court has considered all of the evidence carefully and finds that Charles Morris signed the pink slip containing the *Miranda* warnings, that DeGise twice read these aloud, and that no request was made for a lawyer. The court finds Charles Morris' testimony lacking in credibility on this issue, particularly since on direct examination he denied, but later ad-

mitted in answer to the court's questions, that he had initialed the pink slip containing the *Miranda* warnings. The initials on that slip were quite patently made by the same hand as made the initials on the later F.B.I. statement, and Charles Morris admitted that those were his.

He in addition urges that his statements both to DeGise and to the F.B.I. were improperly coerced. The court finds no basis for that contention. He was advised of his rights. He confessed to the ice cream store robbery within an hour and a half of the commencement of the questioning. He was not threatened with physical harm or made any promises to induce him to confess. Nothing said by the detectives or the F.B.I. agents could be construed as an improper threat. He was given something to eat and drink, and he was not subjected to harassing treatment.

It is true that he was just twenty years old and that, although he had advanced through the ninth grade in school, he had limited ability to read and write. But he impressed the court as having considerable self possession. While he claims to have been fearful of the police, supposing that the shot discharged from the police revolver had been intended for him, he refused to sign a statement confessing to five robberies and insisted he would only sign a statement admitting one.

■ The government has represented to the court that it will not seek to introduce on its direct case Charles Morris' statements to the F.B.I., recognizing that when he said to the F.B.I., "maybe I should talk to a lawyer" any later confession might be within the *Miranda* rule. However, unless the statements to the F.B.I. are, as Charles Morris asserts, inherently unreliable because the product of coercion, they may be used for impeachment purposes. *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 22 L.Ed.2d 1 (1971). For reasons already set forth, the court holds that the statements were not coerced.

## III

The motions to suppress are denied, except that, on consent of the government, the statements of Charles Morris to the F.B.I. shall not be admitted on the government's direct case.

So ordered.