Jerry Lee Martinez was convicted for the illegal possession of cocaine and marijuana. He was sentenced to five years' imprisonment in each case. On this direct appeal[1] from that conviction he contends that the *Page 712 
search of his automobile was illegal. We disagree.
At approximately 3:25 on the morning of April 8, 1991, Alabama State Trooper William D. Eller observed two automobiles exceeding the posted speed limit of 65 miles per hour on Interstate 85 in Montgomery County, Alabama. He observed a Chevrolet Camaro followed by a Lincoln Town Car. He "clocked" both vehicles at 78 m.p.h. Trooper Eller testified:
 "I entered the median and pursued them for a short distance with intention of stopping both vehicles for speeding. I came up behind the Lincoln, gave my office the tag number on that vehicle. I eased past the Lincoln. They were following one behind the other approximately a couple of car lengths. I gave the office the tag number to that vehicle, pulled up alongside, flipped on my alley light on my patrol vehicle, and observed a white male driving the vehicle. And then I eased back behind both cars, flipped on my blue lights. And the Lincoln did stop; but the Camaro didn't." R. 5-6.
Eller identified the appellant as the driver of the Camaro. Trooper Eller radioed that he "needed the brown Camaro with that Georgia plate stopped, and that [he] was going to issue a speeding citation." R. 6.
While Eller was issuing a speeding ticket to the Lincoln, "the brown Camaro came by in the left lane back north bound this time, traveling at a slow rate of speed, probably 35 or 40 mile per hour." R. 7.
Eller testified that the people in the Lincoln told him that they did not know the people in the Camaro. R. 12. Sometime during that night, Eller found drugs in the Lincoln. R. 68-69. Eller searched the Lincoln because:
 "There w[ere] two occupants in the vehicle, they were traveling to Texas, they had conflicting stories. One of them told me they were going to see some people, and the other one said they were going down there for a job. And based on the way they were acting that night, their conflicting stories, I did get a consent to search the vehicle and I did search it." R. 13.
Alabama State Trooper John Clark was also on patrol that night. He testified that he stopped the Camaro in response to Trooper Eller's request: "Eller had radioed that he had attempted to stop two vehicles for speeding. He gave a vehicle description and tag number of the vehicle the subjects were in." R. 14-15.
Clark stated that another trooper, Trooper Carr, had radioed that "he had observed this vehicle [Camaro] parked just over the hill from where Trooper Eller was stopped with its parking lights on in the emergency lane." R. 16. Trooper Clark testified:
 "Trooper Carr radioed back that he had stopped with Trooper Eller and looked up and noticed the same vehicle, the brown Z-28, traveling approximately 30 or 35 miles per hour north on 85 in the passing lane, passing their position at this time, and expressed his concern about the driver's intention at that time." R. 17.
Trooper Clark testified that he and Trooper Carr had a discussion over the radio concerning recent law enforcement information "concerning the possibility of drive-by shootings on police officers making traffic stops" (R. 18): "Our concern at this time due to that was the possibility was there that the vehicle could attempt to drive by the officers on the traffic stop with the Lincoln and possibly cause some harm." R. 18.
Clark pursued the Camaro, observed it exit the interstate, and discovered it "parked in an abandoned parking lot between two businesses with the lights off facing away from the roadway." R. 19. Clark was "very apprehensive, very concerned that there might be a weapon in the car." R. 22. He drew his service pistol and held it at his side. Montgomery Police Corporal Spivey, who was with Trooper Clark, was armed with a shotgun. From his patrol car and using his public address system, Clark ordered the occupants of the Camaro "to shut off the vehicle, put their hands on the dash, no movement inside the car, along those lines. [He] then asked the subjects to throw the keys out of the vehicle. [He] got them out one at a time and had them turn around where [he] could check to make sure there weren't any weapons hidden in their waistbands." *Page 713 
R. 22-23. Trooper Clark patted down the appellant for weapons and had him get on his knees. R. 40. He then took his flashlight and went around Ms. Carole Cabello's waistband looking for weapons. Clark testified: "Both of them were on their knees at one point. I got him out of the car, brought him back, and placed him on his knees, brought her back and placed her on her knees, and we determined that neither one of them had weapons, and they were brought to the front of the car." R. 46-47. After Clark had determined that neither suspect had a weapon, he holstered his weapon and asked them to step to the front of his patrol car and "things relaxed immensely at that point." R. 43.
Once Clark had determined that the two persons were not armed, "the situation relaxed and we placed our weapons back in our holsters and put the shotgun up and began to talk to the subjects outside in front of the vehicle." R. 24. Neither the appellant nor Ms. Cabello had a driver's license. At that time, the individuals were detained because "Trooper Eller had advised [Clark] of his intention of issuing the driver a speeding ticket." R. 25. Clark stated, "We were waiting for Trooper Eller to come up and issue the ticket." R. 48. Trooper Clark established their identity, and the appellant and Ms. Cabello told him that they were traveling with the people in the Lincoln. However, Clark had received information that the people in the Lincoln claimed no association with the Camaro. R. 26, 27.
Trooper Clark testified that he asked the appellant, since he was the driver of the Camaro, "if he objected to me searching his vehicle. . . . He stated no." R. 27. Ms. Cabello was standing right next to Clark at this time. She remained "mute." R. 29. The appellant opened the trunk for the officer after the trooper placed the keys in the trunk and requested the appellant to open the truck. R. 60. Clark did not advise the appellant that he had a right to refuse the request to search. Clark testified that the basis for his wanting to search the Camaro was for weapons: "There was still some apprehension as to whether there may be a weapon in the car and the close proximity we were to the vehicle." R. 48. When asked what was the probable cause for searching the Camaro Clark stated:
 "Well, the traffic stop, trying to assist Trooper Eller, went out of the norm when the vehicle came back past the troopers traveling at a slow speed, and then they pulled off in an abandoned parking lot with their lights off, I was very much concerned, based on my experience and recent events in law enforcement — . . . . Based on the actions of the vehicles running together . . . Based on the fact they stated they were running with the other vehicle, and the other occupants stated they were not running with these people, based on the fact they were going to Corpus Christi from what they stated between two days and two weeks with very little luggage —" R. 44-46.
Clark testified that prior to his stop he never "saw" the appellant and Ms. Cabello commit any traffic violation or engage in any type of criminal activity. R. 36. He testified, "They had committed the offense of speeding for which I was stopping them" based on Trooper Eller's radio communication. R. 37.
On two occasions, Clark asked the subjects if there were any weapons or drugs, or anything in the vehicle. R. 50. Clark testified that on both occasions, "I asked him if he objected to me searching the vehicle; and he stated no." R. 68. Clark testified that if the appellant had refused consent he "would not have searched the vehicle." R. 52, 57.
Corporal Spivey located two small clear plastic baggies containing cocaine in some clothes in the trunk. A .357 magnum revolver was discovered in one of the "tote bags." R. 30. Ms. Cabello identified this bag as hers. R. 33. At that time both subjects were arrested. Up until this point neither suspect had been handcuffed nor read their constitutional rights. After being arrested and read his rights, the appellant "indicated that that was his pistol, that he had purchased the pistol from a friend." R. 34.
Trooper Carr arrived with a "drug dog" which discovered marijuana under the shift console of the car. The vehicle was then towed to the office of the Narcotics Division *Page 714 
of the Alabama Department of Public Safety. R. 31.
In a statement made later that night to Officer Keith Kelly of the Narcotics Division of the Alabama Bureau of Public Safety, the appellant stated, "The Trooper then asked for my permission to search the car; and I said go ahead." R. 82. In their statements, neither the appellant nor Ms. Cabello indicated that they opposed the search of the automobile. R. 82.
At the hearing on the motion to suppress, the appellant testified that he was traveling with the Lincoln, that his engine was overheating and that he turned around and went to the nearest exit to put water in his radiator. He testified, "I was afraid if I didn't comply with their demands [to search] that I would be harmed." R. 101-02. "At that point by the way they pulled me out of the car I figured I didn't have no choice but to tell him yes." R. 111. He consented to the search "at gunpoint." R. 112. He stated that but for the facts that these were police officers, that they had weapons drawn, and that he feared for his safety, he would not have given permission to search his car. The appellant admitted that he told the officers that there was no contraband in the car.
The trial judge found that the appellant voluntarily consented to the search of the automobile:
 "As I understand it, the alleged consent is consistent with his testimony that there wasn't any contraband in the car. . . . It looks to me like that the Court, in looking at all of the circumstances, and he confirmed in this statement that he gave later — . . . 'I said go ahead.' He says he nodded or said yes. There's no question but that the State has shown by direct testimony and the defendant concedes that he did say yes, 'Go ahead,' or affirmative. So the question boils down to was that given under coercion. . . . Well, I think another issue might be does a subsequent affirmation of consent, is that relevant in considering the totality of the circumstances. Is it relevant that two hours after the search he acknowledged that he previously had given consent to search. I'll permit you to get me something on that. So it looks like to me that's two questions. One, there's no question but that a consent in some form was given by the defendant. Was that consent given under coercion, express or implied? And what effect, if any, does an affirmation two hours later of the consent have on the coercion, if any?" R. 115, 123-25.
 The Initial Stop
Trooper Clark had probable cause to stop the appellant based on the information he received from Trooper Eller that the appellant had been speeding. Ward v. State, 484 So.2d 536, 538
(Ala.Cr.App. 1985). See also Ex parte Yeung, 489 So.2d 1106,1109 (Ala. 1986).
 "It is a 'well-recognized principle that, where a group of officers is conducting an operation and there is at least minimal communication among them, [the appropriate course is to] look to the collective knowledge of the officers in determining probable cause.' United States v. Esle, 743 F.2d 1465, 1476 (11th Cir. 1984); see also United States v. Willis, 759 F.2d 1486 (11th Cir. 1985), cert. denied, 474 U.S. 849, 106 S.Ct. 144, 88 L.Ed.2d 119 (1985); United States v. Balsamo, 468 F. Supp. 1363 (D.Me. 1979). '[P]robable cause may emanate from the collective knowledge of the police, though the officer who performs the act of . . . searching may be far less informed.' United States v. Hawkins, 595 F.2d 751, 752-53 n. 2 (D.C. Cir. 1978), cert. denied, 441 U.S. 910, 99 S.Ct. 2005, 60 L.Ed.2d 380 (1979) (citing Smith v. United States, 358 F.2d 833, 835 (D.C. Cir. 1966), cert. denied, 386 U.S. 1008, 87 S.Ct. 1350, 18 L.Ed.2d 448 (1967), and Williams v. United States, 308 F.2d 326, 327 (D.C. Cir. 1962))."
Ex parte Boyd, 542 So.2d 1276, 1284 (Ala.), cert. denied,493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989). See alsoBryant v. City of Gadsden, 574 So.2d 919, 920-21
(Ala.Cr.App. 1990).
As Trooper Clark and Detective Spivey approached the appellant's vehicle, they had reason to fear for their safety and to advance with caution. The United States Supreme Court has recognized that "investigative detentions *Page 715 
involving suspects in vehicles are especially fraught with danger to police officers," Michigan v. Long, 463 U.S. 1032,1047, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983), and that "roadside encounters between police and suspects are especially hazardous." Long, 463 U.S. at 1049, 103 S.Ct. at 3481. See alsoEx parte Carpenter, 592 So.2d 627, 631 (Ala. 1991). In Long, the Court observed that
 "[i]n Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), we held that police may order persons out of an automobile during a stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous. Our decision rested in part on the 'inordinate risk confronting an officer as he approaches a person seated in an automobile.' Id., at 110, 98 S.Ct. at 333. In Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), . . . our decision rested in part on our view of the danger presented to police officers in 'traffic stop' and automobile situations.[13]
Michigan v. Long, 463 U.S. at 1047-48, 103 S.Ct. at 3480. During a traffic stop, "the officer remains particularly vulnerable in part because a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger. . . .' "Id. at 1052, 103 S.Ct. at 3482 (quoting Terry v. Ohio,392 U.S. 1, 28, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968) (emphasis in original).
The potential for danger has increased over the last ten years. The phenomenon of the "drive-by shooting" has prompted the legislature to add two new offenses to the list of capital crimes in Alabama, see Ala. Code, § 13A-5-40(a)(17) and (18) (Supp. 1992), and has multiplied the perils to which police officers are exposed on the highway. See Thomas v. State,625 So.2d 1149, 1152 (Ala.Cr.App. 1992) (wherein the prosecutor observed that drive-by shootings are a "unique phenomenon in current American . . . life"). See also N.D.T v. State,592 So.2d 647 (Ala.Cr.App. 1991); W.M. v. State, 607 So.2d 1303
(Ala.Cr.App. 1992).
Trooper Clark and Detective Spivey approached the appellant's vehicle in a remote area at 3:30 a.m. Cf. Michigan v. Long,463 U.S. at 1050, 103 S.Ct. at 3481 (officer approached suspect seated in vehicle after midnight in rural area). Clark and Spivey knew that the appellant, who appeared to be traveling with the Lincoln, did not stop when Trooper Eller stopped the Lincoln. Instead, the appellant hesitated just over a hill for awhile, then changed direction and slowly drove back past the point at which the Lincoln was stopped. Troopers Clark and Carr had discussed over the radio their concern that the appellant's vehicle might have been attempting to drive by and "cause some harm." R. 18.
Considering the lateness of the hour, the remoteness of the area, and the suspicion which attached to the appellant's conduct after the stop of the Lincoln, Trooper Clark and Detective Spivey prudently approached the appellant's vehicle with weapons drawn. Their actions in directing the appellant and Ms. Cabello to toss out the car keys, exit the vehicle, turn around, walk backwards, and kneel for a pat-down, constituted a legitimate attempt "to neutralize what appeared to be an immediate threat of physical harm." United States v.Phillips, 664 F.2d 971, 1022 (5th Cir. 1981), cert. denied,457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).
 The Consent to Search
The appellant claims that his consent to search was not voluntary because it was given at gunpoint and because he was not told that he had a right to refuse consent.
A search pursuant to a valid consent is constitutionally permissible. See Ex parte Wilson, 571 So.2d 1251, 1255
(Ala. 1990); Hubbard v. State, 500 So.2d 1204, 1221-22
(Ala.Cr.App.), affirmed, 500 So.2d 1231 (Ala. 1986). "When a prosecutor seeks to rely upon consent to justify the lawfulness of a *Page 716 
search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina,391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). See State v. Kyles, 571 So.2d 1283 (Ala.Cr.App.), on return to remand, 574 So.2d 1057 (Ala.Cr.App. 1990).
 "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."
Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041,2047-48, 36 L.Ed.2d 854 (1973).
Mere submission to police authority will not suffice for consent. Schneckloth, 412 U.S. at 233, 93 S.Ct. at 2051; Bumperv. North Carolina, 391 U.S. at 548-49, 88 S.Ct. at 1792; Amosv. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 268,65 L.Ed. 654 (1921); Herriott v. State, 337 So.2d 165, 169
(Ala.Cr.App.), cert. denied, 337 So.2d 171 (Ala. 1976). While a " 'display of weapons is a coercive factor that sharply reduces the likelihood of freely given consent,' " 3 W. LaFave, Searchand Seizure, § 8.2(b) at 181 (2d ed. 1987), the determination of voluntariness requires "careful sifting of the unique facts and circumstances of each case." Schneckloth,412 U.S. at 233, 93 S.Ct. at 2050.
A show of force is a significant factor in the voluntariness equation, but it does not always vitiate consent to search. SeeUnited States v. Kelley, 953 F.2d 562, 566 (9th Cir. 1992);United States v. Phillips, 664 F.2d at 1024; United States v.Cepulonis, 530 F.2d 238, 243-44 (1st Cir.), cert. denied,426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976); United Statesv. Evans, 519 F.2d 1083 (9th Cir.), cert. denied, 423 U.S. 916,96 S.Ct. 224, 46 L.Ed.2d 145 (1975).
If the show of force is initially employed to ensure the safety of the officers or others present, and not to coerce a consent to search, and that force is subsequently withdrawn when the "admittedly frightening situation ha[s] been defused," it is more likely that the suspect's permission to search constitutes consent rather than mere submission to authority. See United States v. Kelley, 953 F.2d at 566.
Here, Trooper Clark testified that, once he determined that neither the appellant nor Ms. Cabello was armed, he holstered his weapon (R. 43), Detective Spivey put up his shotgun (R. 24), and "things relaxed immensely at that point" (R. 43). Clark's testimony was that he asked the appellant for permission to search the vehicle after the weapons were withdrawn. On the other hand, the appellant testified that Detective Spivey maintained possession of the shotgun while Clark requested to search the car, and that the appellant "was afraid if [he] didn't comply with their demands that [he] would be harmed." R. 101-02.
If the evidence relating to a consent search is in conflict, "it is the duty of the trial court to resolve any conflict in the testimony and not within the province of this Court. The trial court [is] in a better position to judge the demeanor of the witnesses." Hollenquest v. State, 394 So.2d 385, 389
(Ala.Cr.App. 1980) (citations omitted), cert. denied,394 So.2d 389 (Ala. 1981). When an accused contests the police version of the facts relating to an alleged consent search, this "presents an issue of fact to be resolved by the trial judge based on his assessment of the relative credibility of the parties; the issue will generally not be rev[ers]ed on appeal unless the judge's finding was clearly erroneous." 1 W. Ringel, Searchesand Seizures, Arrests and Confessions § 9.3(a) at 9-6 (2d ed. 1992). See United States v. Cepulonis, 530 F.2d at 243; Jordanv. State, 384 So.2d 277 (Fla.App. 1980) (trial court's decision as to whether accused was consenting or was submitting to authority would not be disturbed unless clearly erroneous), abrogated on other grounds, Elsleger v. State, 503 So.2d 1367
(Fla.App. 1987).
The police officers' version of the facts in this case is similar to the situation in United States v. Kelley, supra. In that case, Kelley was arrested outside his residence while his girlfriend Holly Bakker and her two young children were present. An FBI agent
 "approached Ms. Bakker and asked her to lie prone on the sidewalk. He had his gun *Page 717 
in his left hand and his right hand was in the center of Ms. Bakker's back. Ms. Bakker's two young children were nearby, crying. [The FBI agent] informed Ms. Bakker that the [a]gents were not there to arrest her, while another [a]gent calmed the children. . . . [The agent] re-holstered his gun and allowed Ms. Bakker to get up. [He] then questioned Ms. Bakker about her relationship with Kelley and, approximately fifteen minutes after Ms. Bakker was initially placed on the ground, obtained her written consent to search the residence."
United States v. Kelley, 953 F.2d at 564. The Court of Appeals rejected the argument that "Ms. Bakker's consent was involuntary because prior to consenting she had been ordered by an armed FBI agent to lie prone on the ground while her children were crying and running about nearby."953 F.2d at 566. It held that
 "[i]n light of the length of time that elapsed between Ms. Bakker first being ordered to the ground and her subsequent consent to the search, during which time an admittedly frightening situation had been defused, the trial court's finding that Ms. Bakker's consent was voluntary was not clearly erroneous."
Kelley, 953 F.2d at 566.
In United States v. Phillips, officers who initially feared for their safety had reason to approach the defendant's vehicle with guns drawn, but later held the guns at their sides and did not point them at the defendant. The defendant later gave the officers permission to search. Although that "consent at gunpoint is a 'single factor [that] sounds very powerful at first,' " the court upheld the search because "the particular circumstances of th[e] case demonstrate[d] that [the defendant's] consent was in fact voluntary." Phillips,664 F.2d at 1022-23. See also United States v. Evans, 519 F.2d at 1083
(when plainclothes officers approached defendant's automobile with guns drawn, ordered him to "freeze," and asked if they could search vehicle, defendant's consent, under totality of circumstances, was voluntary).
The record before us does not indicate the interval between the time when the display of force was withdrawn, "things relaxed immensely" (R. 43), and the appellant was asked for his consent to search. We cannot determine whether that interval approximated the fifteen minutes present in Kelley. However, it is particularly significant in this case that the circuit court had the benefit of viewing a videotape of the entire occurrence between the appellant and the two officers. The court's voluntariness determination was based not only on the usual credibility choices required of any court presented with witnesses after the fact, but also on the actual film of what occurred prior to the search. The court was therefore able to make a visual judgment about whether the arguably coercive atmosphere which initially existed had been defused by the time the appellant was asked for permission to search the vehicle.
We also find it significant, as did the trial court, that two hours after the search the appellant, in a narrative statement given to Officer Keith Kelly of the Narcotics Division, Department of Public Safety, "acknowledged that he previously had given consent to search." R. 125. See United States v.Evans, 519 F.2d at 1083 (when "[a] month after the search, . . . [defendant] told an investigator that his consent was voluntary," that fact, taken together with other relevant circumstances, "g[ave] adequate support for the trial court's finding that the consent was voluntarily given"). Compare Statev. Knaubert, 27 Ariz. App. 53, 550 P.2d 1095, 1099 (1976) (fact that consent to search is given in the context of confession to the crime is relevant).
We have considered the fact that the appellant was not told he had the right to refuse to consent to the search, and we do not find it to be determinative here. In Schneckloth v.Bustamonte, the Supreme Court observed that "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." 412 U.S. at 227,93 S.Ct. at 2048. See generally 1 Ringel § 9.2 at 9-3. The facts of this case provide a reason to believe that, notwithstanding the failure to inform the appellant that he had the right to refuse to allow the search, his consent was nevertheless voluntary. *Page 718 
The appellant twice denied that there were any "weapons or drugs or anything" in the vehicle. R. 27, 28, 50. "[A] belief that nothing personally incriminating is to be found in the place the police want to search [is a] factor tending to show that a consent is voluntary." 3 LaFave at § 8.2(h) at 206. In addition, the record reveals that the appellant's attorney recommended, and the appellant agreed, to a guilty plea in this case despite the appellant's claim that he had no knowledge ofthe presence of the cocaine in the trunk, because
 "strategically it would have been foolish to advise him to go to trial and subject himself to a mandatory eight-year prison sentence. The video-tape, the circumstantial evidence proffered by the State at the suppression hearing, and the defendant's demeanor jointly indicated an extremely low probability for an acquittal at trial, regardless of whether or not he, as a matter of fact, had actual knowledge that the drugs were in the trunk." C.R. 45.
The appellant's defense, had he gone to trial, apparently would have been that the drugs were placed in his trunk, without his knowledge, by his travelling companions in the Lincoln. See C.R. 45. His consent to search was entirely consistent with that defense. As the federal district court observed inUnited States v. Iovine, 444 F. Supp. 1085 (E.D.N.Y. 1978),
 "If defendant had any hope of persuading the FBI of the truth of this story, it would have been eminently rational for him to give consent to a search. . . . He might well have believed that only consent would be consistent with lack of knowledge of the presence of the [contraband]."
Iovine, 444 F. Supp. at 1089.
The argument that "no sane man who denies his guilt would actually be willing that policemen search . . . for contraband which is certain to be discovered," Higgins v. United States,209 F.2d 819, 820 (D.C. Cir. 1954), has generally been rejected, see 3 LaFave § 8.2(h) at 208, and has specifically been rejected by this Court, Quinn v. State, 611 So.2d 483, 487
(Ala.Cr.App. 1992). A defendant who believes that there is no contraband in the place to be searched or that it is hidden too well to be found might well give his voluntary consent to a search, 3 LaFave § 8.2(h) at 208 n. 178. On the other hand, the defendant may simply be "giving up."
 '[T]he pressure exerted on a criminal by the realization that the jig is up is far different from the deliberate or ignorant violation of personal right that renders apparent consent ineffective.' [Gorman v. United States, 380 F.2d 158, 165 (1st Cir. 1967)]. The soundness of that principle is dramatically revealed in North Carolina v. Alford, [400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970)] where the Court held that a defendant might voluntarily plead guilty even though he claimed to believe he was innocent. If at the time that a particular question is asked there is no agreeable answer, the fact that the answer chosen is not a pleasant one does not mean necessarily that it was not voluntarily selected. The alternative might have seemed worse.
 "The application of that principle to consent to search is particularly apt. A defendant may believe that search is ultimately inevitable whether he consents or not. In such circumstances a suspect might well feel he is better off to consent than to oppose."
Leavitt v. Howard, 462 F.2d 992, 997 (1st Cir.) (footnotes omitted), cert. denied, 409 U.S. 884, 93 S.Ct. 175,34 L.Ed.2d 140 (1972), quoted in United States v. Cepulonis,530 F.2d at 244; 3 LaFave at § 8.2(h) at 208-09. "Bowing to events, even if one is not happy with them, is not the same thing as being coerced." State v. Lyons, 76 Wn.2d 343, 458 P.2d 30, 32
(1969).
Although we recognize that this is a close case, after a careful examination of the law and the facts in this case, we conclude that the circuit court's ruling that the appellant's consent was voluntary is not clearly erroneous.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[13] "According to one study, 'approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings — A Tactical Evaluation, 54 J.Crim. L.C. P.S. 93 (1963).' Adamsv. Williams, supra, at 148, n. 3, 92 S.Ct. at 1924 n. 3."
[1] The appellant's initial appeal was dismissed because notice of appeal was not timely filed. Martinez v. State, 602 So.2d 504
(Ala.Cr.App. 1992). On February 1, 1993, the trial court granted the appellant's motion for an out-of-time appeal. C.R. 65. *Page 719